**NATIONAL CONFERENCE OF FIREMEN AND OILERS, SEIU, AFL–CIO, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Cook Family Foods, Inc., Intervenor.**

Nos. 97–1365, 97–1376.

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1998.

Decided June 12, 1998.

Erick J. Genser argued the cause and filed the briefs for petitioner National Conference of Firemen and Oilers, SEIU, AFL–CIO.

William M. Muth, Jr., argued the cause for petitioner Cook Family Foods, Inc., with whom Kelvin C. Berens was on the briefs.

Rachel I. Gartner, Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David S. Habenstreit, Supervisory Attorney, were on the brief.

Kelvin C. Berens and William M. Muth, Jr., were on the brief for intervenor Cook Family Foods, Inc.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

ROGERS, Circuit Judge:

Cook Family Foods, Inc. ("Cook"), and the National Conference of Firemen & Oilers, SEIU, AFL–CIO ("the union"), petition for review of a decision and order of the National Labor Relations Board ("the Board"). Cook fired nine strikers for damaging cars entering and leaving a plant that they were picketing. An administrative law judge ordered reinstatement for the discharged strikers on the ground that their misconduct was not as serious as the misconduct of two supervisors who displayed and sighted a rifle in the plant parking lot in view of picketers located roughly 140 yards away. The Board reversed that order, although it agreed that the supervisors' actions with the firearm violated the National Labor Relations Act ("the Act"). Because we conclude that the Board's determinations that the supervisors engaged in an unfair labor practice and that the company did not unfairly discriminate against the terminated strikers were reasonable and supported by substantial evidence, we deny the petitions.

I.

A hotly contested strike at Cook's meat processing facility in Grayson, Kentucky, lasted from November 1993 to April 1995 and was marked by continuous picketing of the facility and numerous acts of violence. After establishing that it would not discharge any employee accused of strike-related misconduct unless the employee admitted the misconduct or there was "indisputable" evidence thereof, Cook discharged nine striking employees but no nonstriking employees under this standard. *See Cook Family Foods, Inc.,* 323 N.L.R.B. No. 62, at 1 (1997). Three of

the fired strikers set up or threw nails on the road leading to the Cook's facility, one placed caltrops (devices with four spikes positioned such that one always projects upward) in front of vehicles entering the plant, and another did the same with both nails and caltrops. Two others not only placed nails on the road leading to the facility, but also kicked a vehicle. Another slashed the tires on a nonstriking employee's vehicle, and still another attempted to run a car occupied by three nonstriking employees off the road. *See id.* at 1, 3–5.

During the strike, two nonstriking company supervisors examined a firearm that another employee had for sale in the plant parking lot. *See id.* at 7. The administrative law judge found that:

> The two supervisors went to a vehicle which was located approximately 140 yards northeast of the picket line manned by four strikers and 155 yards southeast of the trailer used by the Union as its strike headquarters. [The supervisors] removed a high-powered rifle with a telescopic sight from the car. Each of the men examined the rifle and sighted it on a target to the northeast of their position, but both denied pointing the rifle at the pickets or trailer.

*Id.* (footnotes omitted). The strikers saw the supervisors with the rifle and called the police. Cook investigated the incident and issued written warnings to both supervisors "for using poor judgment in displaying a gun in front of pickets," but did not take further disciplinary action.

The union filed charges against Cook for its firing of the nine strikers, and the Board's Acting Regional Director subsequently issued a complaint arguing that Cook should not have discharged the strikers for strike-related misconduct without also discharging the two supervisors. Under the Board's precedents, an employer "may not knowingly tolerate behavior by nonstrikers or replacements that is at least as serious as, or more serious than, conduct of strikers that the employer is relying on to deny reinstatement to jobs." *Aztec Bus Lines, Inc. v. San Diego*

*Afl–Cio Bus Drivers*, 289 N.L.R.B. 1021, 1027 (1988). The administrative law judge agreed that Cook's decision to terminate the strikers without terminating the supervisors was discriminatory. The judge explained that the misconduct of the supervisors had violated the organizational rights of workers protected by the National Labor Relations Act:

> The two supervisors' admitted possession and brandishing of a high-powered rifle took place (1) without a defensive motive, (2) during an already violent strike, (3) in close proximity to the picket line, (4) in broad daylight, and (5) within the view of peacefully picketing employees who reported the event to the police. Under these circumstances, I conclude that the conduct of [the supervisors] "may reasonably tend to coerce or intimidate employees in exercise of rights protected by the Act"....

*Cook Family Foods*, 323 N.L.R.B. No. 62, at 7 (quoting *Clear Pine Mouldings, Inc. v. International Woodworkers of America*, 268 N.L.R.B. 1044, 1046 (1984)). The administrative law judge also concluded that because the supervisors had displayed a firearm that carried with it "the implicit threat of the use of deadly force," and because "the threat of physical harm is by its nature more serious than a threat to property," the supervisors' misconduct was more severe than the actions of the terminated strikers, who had simply sought to damage automobiles leaving and entering the plant. *Cook Family Foods*, 323 N.L.R.B. No. 62, at 7 (quoting *Gibson Greetings, Inc.*, 310 N.L.R.B. 1286, 1313 (1993), and *Chesapeake Plywood, Inc. v. International Woodworkers of America–Region V*, 294 N.L.R.B. 201, 205 (1989)) (internal quotation marks omitted). Thus, the judge ordered that seven of the discharged strikers be offered reinstatement and compensation for wages lost and that one other be compensated for backpay. *See id.* at 7–8.[1]

Upon Cook's appeal, the Board affirmed in part and reversed in part. First, the Board agreed with the administrative law judge that the supervisors' "examining of the rifle

---

1. The administrative law judge did not order any remedy for the striker who had attempted to run three nonstriking employees off the road, concluding that this misconduct was more serious than that of the supervisors. *See Cook Family Foods*, 323 N.L.R.B. No. 62, at 7.

within the sight of the pickets" was an unfair labor practice under the Act. *Id.* at 2 n. 5. Accordingly, the Board ordered Cook to cease and desist from "[c]oercively displaying firearms to peacefully picketing employees" or "[i]n any like manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act." *Id.* at 8; *see id.* at 2. In addition, the Board ordered Cook to post a notice to employees informing them of their rights under the Act and affirming that Cook "will not coercively display firearms to peaceful picketing employees" or in any similar way interfere with the employees' rights under the Act. *Id.* at 2–3. However, the Board reversed the administrative law judge's conclusion that Cook's failure to discharge the two supervisors was discriminatory. Applying the *Aztec Bus Lines* test, the Board declined to find that the supervisors' "errant actions, undertaken solely for the purpose of examining a rifle that was for sale, were of equal or greater severity than the strikers' misconduct, which was intended to cause property damage." *Id.* at 2. Thus, the Board refused to find that the failure to discharge the supervisors was discriminatory and concluded that Cook's discharge of the strikers did not violate the Act.

## II.

█ Cook contends that the Board erred in concluding that the supervisors' conduct violated section 8(a)(1) of the Act, which provides that "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights" guaranteed under section 7 of the Act. 29 U.S.C. § 158(a)(1) (1994); *see also id.* § 157. The union, in turn, challenges the Board's decision upholding Cook's termination of the nine strikers without similar discipline of the two supervisors.

The court reviews the Board's factual findings to determine whether they were supported by substantial evidence and its legal conclusions for reasonableness. "[T]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall ... be conclusive." *Id.* § 160(f). We will uphold the Board's legal conclusions unless it acted arbitrarily or otherwise erred in applying established law to the facts. *See General Elec. Co. v. NLRB,* 117 F.3d 627, 630 (D.C.Cir.1997).

### A.

As to the supervisors, Cook maintains that the Board failed adequately to consider the gun-carrying climate surrounding the Grayson facility when it determined that the supervisors' examination of the hunting rifle constituted an unfair labor practice pursuant to section 8(a)(1) of the Act. Cook presented evidence that Kentucky permits its residents to carry concealed weapons, that half of the men who lived in and around Grayson carried firearms in their vehicles, and that some employees in the plant carried weapons in their vehicles. Therefore, Cook maintains, the Board's decision that the supervisors committed an unfair labor practice when they displayed a hunting rifle in the plant parking lot was irrational.

The Board has previously concluded that the display of a gun to strikers tends to interfere with their right to organize collectively. Thus a supervisor who "held up a holstered handgun for [a worker] to see" in the course of an argument with a picketing worker interfered with that worker's rights under the Act. *Ford Bros., Inc. v. Ohio Conference of Teamsters,* 294 N.L.R.B. 107, 107 (1989). Similarly, a company president who carried a loaded gun across a picket line also violated the workplace rights of the picketers. *See Highland Plastics, Inc.,* 256 N.L.R.B. 146, 160–61 (1981). As the Board has explained, "a gun is an inherently dangerous weapon." *Keco Indus., Inc.,* 301 N.L.R.B. 303, 303 (1991). The supervisors did not display the rifle defensively in response to threatening conduct by strikers; the picketers were nowhere near the supervisors when they examined and sighted the gun. *Cf. Cabot Corp.,* 223 N.L.R.B. 1388, 1390–91 (1976). The Board's conclusion that the display and sighting of a hunting rifle in the plant parking lot in front of the picketers did not represent a departure from these precedents. Although the Board indicated for the first time that a gun may be brand-

ished some distance away from a picketing worker—here, 140 yards away—and still interfere with the organizational rights protected by the Act, that conclusion follows logically from prior precedents.

Of course, as Cook observes, the mere presence of a dangerous weapon in the workplace, without more, would not necessarily constitute a violation of the Act, especially in a locale where weapons possession is as accepted and common as it is in Grayson. In *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 738 F.2d 1404 (4th Cir.1984), for example, the Fourth Circuit agreed with the Board that a striker's "mere possession of a small knife unaccompanied by circumstances indicating a threat of force does not reasonably tend to threaten or intimidate nonstrikers." *Id.* at 1409. Yet while not every display of a dangerous weapon triggers the strictures of the National Labor Relations Act, the Board's determination that the supervisors' actions constituted an unfair labor practice was consistent with its precedents and reasonable under the circumstances. Cook contends that the supervisors' examination of the gun is indistinguishable from the striker's possession of a knife in *Newport News*, but we disagree. *Newport News* was "not a case in which the employee brandished his weapon or made any gestures to drawing attention to it," *id.* at 1409; by contrast, Cook's supervisors drew attention to their gun by displaying it in front of the picketers and targeting it using a telescopic sight. Furthermore, the Board's decision that the scoped rifle, as opposed to a small knife, would tend to instill fear in the assembled picketers under the circumstances was consistent with both its own findings and the Supreme Court's observation that "the display of a gun instills fear in the average citizen." *McLaughlin v. United States*, 476 U.S. 16, 17–18, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986); *see also Keco Indus.*, 301 N.L.R.B. at 303. Indeed, the fact that the picketers who saw the rifle immediately called the police supports the Board's conclusion that the display of the rifle tended to intimidate the employees in the exercise of their workplace rights. The strikers' appeal to the police also lessens the credibility of Cook's argument that weapons possession was so common in Grayson that, even in the context of a contentious, violent strike, the supervisors' display of a high-powered rifle with a telescopic sight near picketers was not an unreasonably coercive action. Moreover, even if the supervisors' activity was legal under Kentucky law, state gun laws do not determine whether actions that are legal under those laws also violate the Act. As the Board has explained, "[t]he legality of ... conduct under state laws is not dispositive of what are separate and distinct issues raised under the National Labor Relations Act." *Id.* at 304.

Consequently, the Board acted reasonably in concluding that the supervisors violated section 8(a)(1) despite the fact that a number of employees and Grayson residents might legally carry firearms in their vehicles or on their person.

## B.

■ Ordinarily, a striking employee remains an "employee" under the Act, *see* 29 U.S.C. § 152(3) (1994), and may not generally be fired or refused reinstatement at the conclusion of the strike. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). However, employee discipline that neither coerces nor discriminates on account of activity protected by the Act does not implicate the Act. *See NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 254–57, 59 S.Ct. 490, 83 L.Ed. 627 (1939). Because serious misconduct by strikers is not protected by the Act, reasonable discipline, including the refusal to reinstate employees for such misconduct, does not constitute an unfair labor practice under sections 8(a)(1) or 8(a)(3) of the Act. *See* 29 U.S.C. § 158(a)(1), (a)(3); *NLRB v. Champ Corp.*, 933 F.2d 688, 700 (9th Cir.1990); *Columbia Portland Cement Co. v. NLRB*, 915 F.2d 253, 257 (6th Cir.1990); *Paramont Mining Corp. v. NLRB*, 631 F.2d 346, 349 (4th Cir.1980). One form of striker misconduct that the Board has concluded may justify discharge is vandalism to automobiles. *See, e.g., General Indus. Employees Union, Local 42 v. NLRB*, 951 F.2d 1308, 1314 (D.C.Cir. 1991); *Newport News*, 738 F.2d at 1410; *Certainteed Corp.*, 282 N.L.R.B. 1101, 1118

(1987). Cook therefore could permissibly discharge the nine strikers for their attacks on replacement worker automobiles during the strike.

■ But while serious strike-related misconduct may be punished under the Act, "if the company knew its employees were equally culpable of misconduct and chose to discipline only the strikers then an unfair labor practice charge would be founded." *Garrett R.R. Car & Equip., Inc. v. NLRB*, 683 F.2d 731, 740 (3d Cir.1982); *accord Aztec Bus Lines*, 289 N.L.R.B. at 1027. The test is one of degree, and the court has recognized that the Board is well-suited to evaluate whether an employer knowingly tolerated misconduct by nonstrikers that was at least as "serious," *see id.* at 1027, as the misconduct committed by fired striking workers. Thus, "the Board may make reasonable judgments about the seriousness of various offenses—or more properly about an employer's explanation for treating some offenses more harshly than others." *Gibson Greetings, Inc. v. NLRB*, 53 F.3d 385, 393 (D.C.Cir.1995).

■ The Board decided that the supervisors' "reason for handling the rifle was unrelated to the pickets or the strike" and that, under the circumstances, the supervisors' action was not "the equivalent of displaying firearms to pickets while crossing picket lines." *Cook Family Foods*, 323 N.L.R.B. No. 62, at 2. Explaining that the distance between the strikers and the supervisors was significant, the Board concluded that the gun was not being used to intimidate the strikers, but rather being examined for sale, and observed that the supervisors sighted the rifle away from the pickets.[2] *See id.* Furthermore, the Board contrasted the intent of the supervisors with that of the discharged strikers. The "poor judgment" of the supervisors in displaying the rifle, in the Board's view, did not compare with the intentional harm to the automobiles by the strikers. *Id.*

Despite the union's contention to the contrary, the Board's decision in *Keco Industries* does not require a different conclusion. In that decision, the Board found that because a striker with a gun in his waistband was "in the vicinity of the gate used by nonstrikers," which was "often a focal point for the venting of anger and frustration," making "[t]he inherent danger of a gun ... particularly acute," the employer could terminate the striker without committing an unfair labor practice. *Keco Indus.*, 301 N.L.R.B. at 303. While *Keco Industries* indicated that the possession of a firearm could constitute grounds for termination during a strike, it does not suggest that workers with firearms must be terminated. Nor does it compare gun possession with intentional vandalism, such as that committed by the discharged strikers here. The Board addressed and distinguished *Keco Industries*, reasonably albeit briefly, based upon the distance of the supervisors from the picketers. *See Cook Family Foods*, 323 N.L.R.B. No. 62, at 2 n. 4.

Nor is the Board's conclusion inconsistent with its *Gibson Greetings* precedent. In that case, the Board adopted an administrative law judge's conclusion that a company's failure to discipline a nonstriking employee who "drove through the picket line, at least once, with a gun displayed on the dashboard of her car" when it had terminated strikers who had damaged cars and assaulted workers, was discriminatory. *Gibson Greetings*, 310

---

**2.** The union seeks a remand of the case to·an administrative law judge to determine whether the supervisors pointed the rifle at the picketers or away from them. The union maintains that the administrative law judge failed to resolve a credibility dispute between the supervisors, who claimed that they pointed the rifle away from the pickets, and the picketers, who disagreed. The administrative law judge found that the supervisors "sighted [the rifle] on a target to the northeast of their position," away from the picket line to the southwest and the trailer to the northwest of the supervisors. *Cook Family Foods*, 323 N.L.R.B. No. 62, at 7. More to the point, the

union failed to raise the contention that a further finding was necessary while the case was before the Board. "No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see, e.g.; Noel Foods. v. NLRB*, 82 F.3d 1113, 1120–21 (D.C.Cir.1996); *NLRB v. L & B Cooling, Inc.*, 757 F.2d 236, 240 (10th Cir.1985); *NLRB v. R.J. Smith Constr. Co.*, 545 F.2d 187, 192 (D.C.Cir.1976). The union has alleged no such extraordinary circumstances.

N.L.R.B. at 1309, *aff'd in relevant part,* 53 F.3d 385, 393–94 (D.C.Cir.1995). *Gibson Greetings* involved a confrontation at a picket line, where the Board has concluded that tensions are likely to be high. *See id.* at 1313; *cf. Chesapeake Plywood,* 294 N.L.R.B. at 203–04. The supervisors sighted their hunting rifle 140 yards away from the picket line and did not point it at the picketers. *See Cook Family Foods,* 323 N.L.R.B. No. 62, at 2. As the Board explained, "unlike the individuals in *Gibson Greetings* ..., whose display of firearms while *crossing* the picket line clearly was intended to intimidate the pickets, [the supervisors'] reason for handling the rifle was unrelated to the pickets or the strike." *Id.* The Board did not act inconsistently by treating the supervisors differently than the armed nonstriker in *Gibson Greetings.*

Because the *Aztec Bus Lines* calculus involves balancing types of strike misconduct and weighing of facts, the court properly defers to the Board where its factual findings are supported by substantial evidence, as they are here. *See Gibson Greetings,* 53 F.3d at 393. The Board's conclusion that Cook might legitimately decide that the supervisors' unintentional misconduct warranted less punishment than the intentional vandalism by the strikers was not unreasonable.

Accordingly, we deny the petitions and order enforcement of the decision and order of the Board.