**Alvin BLYER, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**PRATT TOWERS, INC., Respondent.**

**No. 00–CV–2499 (FB)(MDG).**

United States District Court,
E.D. New York.

Nov. 16, 2000.

---

Nancy K. Reibstein, April Wexler, National Labor Relations Board, Brooklyn, NY, for the Petitioner.

Kevin J. McGill, Jennifer M. Crook, Clifton Budd & DeMaria, LLP, New York, NY, for the Respondent.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

Petitioner Alvin Blyer, Regional Director of Region 29 ("Regional Director") of the National Labor Relations Board ("NLRB" or "Board"), brings this proceeding against respondent Pratt Towers, Inc. ("Pratt") pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) ("the Act") for, *inter alia,* a temporary injunction requiring that Pratt offer immediate interim reinstatement to employees who were refused reinstatement following a strike against Pratt, and that Pratt recognize and offer to bargain in good faith with Local 32B–32J, Service Employees International Union, AFL–CIO ("the Union"), as the employees' exclusive collective bargaining representative. Section 10(j) of the National Labor Relations Act provides that upon issuance of an administrative complaint charging that a person has engaged in or is engaging in an unfair labor practice, the Board may petition the district court "for appropriate temporary relief or a restraining order." *See* 29 U.S.C. § 160(j) (1998). The petition is granted.

### BACKGROUND

### I. Procedural History

On April 1, 1999, two Pratt employees, Lawrence "George" Folkes ("Folkes") and

Keith Robinson ("Robinson"), filed unfair labor practice charges in NLRB Case Nos. 29–CA–22657 and 29–CA–22660, respectively. The charges alleged that Pratt had violated section 8(a)(1) and (3) of the Act by refusing to reinstate them, despite their unconditional offers to return to work, in retaliation for their protected union activity. On April 6, 1999, the Union filed an unfair labor practice charge against Pratt in NLRB Case No. 29–CA–22666, alleging that Pratt had violated section 8(a)(1) and (3) of the Act by conditioning the employees' reinstatement upon abandonment of their membership in the Union, and by refusing to reinstate the employees because of this membership.[1]

Pratt, in turn, filed an unfair labor practice charge against the Union in Case No. 29–CC–1285. Pratt alleged that the Union had violated section 8(b)(4)(ii)(A) of the Act by engaging in a strike to compel Pratt to enter a contract with the Union containing an illegal term (a "picket line" clause prohibited by section 8(e) of the Act).

On May 17, 1999, Case Nos. 29–CA–22657, 29–CA–226660 and 29–CA–22666 were consolidated. A hearing in the consolidated cases and Case No. 29–CC–1285 was held before an Administrative Law Judge ("the ALJ") during fifteen days between July 15 and August 13, 1999 ("the hearing"). In the hearing, the ALJ granted a motion by the NLRB's General Counsel to amend the complaint to further allege that Pratt had violated section 8(a)(1) and (5) of the Act by bargaining in bad faith when it engaged in a premeditated course of bargaining table conduct designed to undermine the status of the Union, and when it implemented a premeditated plan to deny the employees their statutory rights to bargaining in good faith through a representative of their own choosing.

On November 19, 1999, the Union filed a charge against Pratt in Case No. 29–CA–23137, alleging that Pratt had violated section 8(a)(1) and (5) of the Act by unlawfully withdrawing recognition from the Union. Upon filing this charge, the Union requested that the Regional Director seek injunctive relief from this Court. On April 7, 2000, Case No. 29–CA–23137 was consolidated with the three cases previously consolidated.

The proceeding before this Court was instituted by the Regional Director on May 2, 2000. Thereafter, on May 16, 2000, the ALJ issued a decision in Case No. 29–CC–1285. He concluded that the Union's strike had not violated the Act, and recommended dismissal of Pratt's complaint. On September 27, 2000, the ALJ issued a decision in Case Nos. 29–CA–22657, 60 and 66. He concluded, *inter alia*, that Pratt had violated section 8(a)(1) and (3) of the Act by unlawfully discharging and refusing to reinstate the employees unless they abandoned the Union, and section 8(a)(1) and (5) of the Act by engaging in a premeditated course of conduct designed to undermine the status of the Union as the employees' bargaining representative, and to prevail upon the employees to abandon the Union.

The Court heard oral argument on November 9, 2000. Pratt informed the Court at that time that its appeal of the ALJ's May 2000 decision is *sub judice* before the NLRB, and that it intends to appeal the September 2000 decision to the Board.

## II. Facts

The following facts are drawn from the testimony and exhibits before the ALJ. They are undisputed in all material respects. At oral argument, the parties agreed that there was no need for the Court to hold a separate hearing, or other-

1. The parties stipulated that the building's maintenance employees, Curtis Bailey ("Bailey"), Theorgy Brailsford ("Brailsford"), Folkes, Jude Obaseki ("Obaseki"), Robinson and Angel Venzen ("Venzen") (collectively "the employees" or "the strikers"), had participated in the strike and requested reinstatement.

wise to consider facts that were not before the ALJ.

Pratt operates a twenty-three story, 326–unit residential cooperative apartment building in Brooklyn, New York ("the building"). The employees all worked in the building, and prior to April 1998, they were represented by Local 2. On April 7, 1998, a majority of the employees voted to replace Local 2 with the Union. On April 21, 1998, the Union was certified pursuant to the Act as the employees' exclusive collective bargaining representative. On April 27, 1998, Pratt's board of directors ("directors") held a closed meeting, and indicated that they believed the election of the Union had created "a very bad situation" for Pratt. GC Ex. 14.[2] The directors were informed by Kevin Donahue ("Donahue") of Elm Management ("Elm"), Pratt's managing agent at the time, that the Union's wage and benefit package would cost "much more" than Pratt had been accustomed to paying under its contract with Local 2. *Id.* During this meeting, Donahue commented that if negotiations with the Union were allowed to "drag out" long enough, there was a chance that the employees would vote to decertify the Union. *Id.* Donahue also noted that the employees might not have medical coverage while negotiations were ongoing. Joseph Gaggen, Elm's director of management, stated at a directors meeting on August 11, 1998 that it was to Pratt's benefit not to have a union, and suggested offering the employees good wages and benefits as a way of "keeping them out of the Union altogether." GC Ex. 19.

At the first negotiating session between Pratt and the Union on August 26, 1998, the Union's attorney, in lieu of negotiation, offered Pratt a choice between two contracts that the Union had negotiated with other employers: the Real Estate Advisory Board ("RAB") contract and the Independent Apartment House Agreement of

1997 ("Independent Agreement"). Because Pratt could not afford the RAB contract, the Independent Agreement became the starting point for negotiations.

Subsequent negotiating sessions on September 24, 1998, October 27, 1998, and January 7, 1999, led to agreement on some modifications to the Independent Agreement. Pratt had agreed to all terms in the Independent Agreement except for nine items set forth in a letter from Kevin McGill ("McGill"), Pratt's attorney, to Ira Strum ("Strum"), the Union's attorney, dated October 8, 1998. The nine provisions remaining in issue were: 1) wage scale; 2) health plan contributions; 3) annuity plan contributions; 4) pension plan contributions; 5) arbitration by the Office of the Contract Arbitrator; 6) "no reduction in force" clause; 7) "roll-over" or "evergreen" clause; 8) union security clause; and 9) inclusion of security guards in the bargaining unit description.

In a report to the directors dated December 8, 1998, Eunice Johnson ("Johnson"), Pratt's new property manager, relayed to the directors McGill's suggestion "that the [directors] indirectly propose to the staff the possibility of going to another union, such as Local 670." GC Ex. 21. McGill later testified to making a similar suggestion to the directors following one of the negotiating sessions.

Following the January 7th session, the parties believed that they had reached an impasse in negotiations. Strum then told McGill that he wanted Pratt to sign the Independent Agreement "as is" that night. Tr. 1401–02. Negotiations did not resume. On January 8th, the directors sent a memorandum to Pratt's cooperators, warning that the Union intended to strike unless Pratt agreed to its "wage and fringe benefit demands." GC Ex. 22.

On February 22, 1999, the employees went out on strike at the Union's direction.

**2.** References to the record before the ALJ cited herein are abbreviated as follows: "Tr. # " refers to pages from the hearing transcript. "GC Ex. # " refers to General Counsel's exhibits at the hearing. "Resp. Ex. # " refers to Pratt's hearing exhibits.

The Union's business agent instructed Venzen, the building's acting superintendent, to shut down the boiler, allegedly for the safety of the building's tenants, and to notify management that the boiler was being shut down. During the strike, a number of incidents allegedly occurred that, in addition to the boiler shut-down, were subsequently relied upon by Pratt as misconduct bases for denying the employees reinstatement: 1) an excessive number of trash bags accumulated in the trash room on the second day of the strike; 2) Robinson harassed and threatened replacement workers; 3) city sanitation workers refused to cross the employees' picket line unless ordered by the Department of Health; 4) a padlock on an outside gate had been jammed with a nail; 5) garbage was found strewn about the building's yard; 6) Brailsford followed Board president Valarie Brooks ("Brooks") to a delicatessen near the building while he yelled at her, then momentarily blocked her entrance to the delicatessen; 7) the air was let out of a tire on Brooks's car; 8) the drain in the building's laundry room was clogged with rocks; and 9) the employees used a walkway on the building's property.

On March 11 and March 15, 1999, the six striking employees made unconditional offers to return to work. The strikers were told by Johnson, on the directors' behalf, that their reinstatement could only be considered if they provided Pratt with a letter stating that they had severed their connection with the Union. On March 16, 1999, the directors met to discuss the strikers' requests for reinstatement. Brooks informed the directors that "all the strikers came to ask for their jobs back." Tr. 1764. She then added, "we don't want that ... if we could prove misconduct on the part of one of the men, then that would be grounds not to have to take them back." Resp. Ex. 23. McGill, however, reportedly remarked that he was "impressed" with the strikers' conduct. Resp. Ex. 21. He said that some other strikes he had observed had become "very ugly." *Id.* McGill further stated that, "when we tell

these individuals that we are not going to offer them reinstatement [charges will be filed against Pratt with the NLRB]." Resp. Ex. 23. Finally, Johnson stated, "it's the [directors'] position they really don't want to bring any of these men back." *Id.* The minutes further reflect the directors' awareness that "May 1st [the earliest date the employees could vote to decertify the Union] is approaching, so there is a need to know" whether the employees' reinstatement can be "stalled." *Id.*

At the conclusion of the March 16th directors meeting, the members discussed the possibility of arranging for a different union to represent the employees. Brooks reported that she had already contacted Local 2 to determine whether it would resume representation of the employees if they left the Union. She reported that Local 2 would not take the employees back.

By letter dated March 16, 1999, Pratt advised the employees that a response to their request for reinstatement would be made following the conclusion of Pratt's investigation of striker misconduct. Sometime between March 16th and March 23rd, Johnson contacted McGill and asked him to prepare a draft letter for the directors' consideration denying the employees reinstatement.

The directors met again on March 23rd. Brooks read McGill's draft letter to the directors. However, there was no discussion among the directors about whether to reinstate the employees. Further, the directors were advised for the first time that the strike may have been illegal. McGill testified that he first reviewed the proposed contract for illegal or non-mandatory clauses after the March 16th meeting. McGill's review led him to conclude that the Independent Agreement contained unlawful terms, and that Pratt could deny reinstatement if it asserted that obtaining a contract including these terms was an object of the strike. He testified that he undertook this review because he needed

to advise the directors' of their options in light of the employees' request for reinstatement. On March 24th, Pratt sent each striker a letter denying reinstatement. The letter stated that denial was the result of the directors' "conclusion that the strike was not a protected strike.... In addition, strikers engaged in serious misconduct during the course of the strike." GC Ex. 3.

## DISCUSSION

In order to grant relief under section 10(j), the Court must find "(1) 'reasonable cause to believe that an unfair labor practice has occurred;' and (2) that [granting] injunctive relief would be just and proper." *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir.1999) (quoting *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir.1995)). In making its determinations, the Court should give the Regional Director's interpretation of the facts "the benefit of the doubt." *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 37 (2d Cir.1975).

The Regional Director argues that there is reasonable cause for this Court to determine that Pratt violated section 8(a)(1) and (3) of the Act by refusing to reinstate the employees after they made an unconditional offer to return to work, and section 8(a)(1) and (5) of the Act by refusing to bargain in good faith with the Union. The Regional Director further asserts that the interim relief he has requested is just and proper.

## I. Reasonable Cause

The "reasonable cause" requirement is satisfied where the Regional Director has come forward with evidence "sufficient to spell out a likelihood of violation." *Danielson v. Joint Bd. of Coat,*

*Suit and Allied Garment Workers' Union,* 494 F.2d 1230, 1243 (2d Cir.1974) (internal quotations omitted). The Court, however, "need not make a final determination that the conduct in question is an unfair labor practice." *Major League Baseball,* 67 F.3d at 1059. In making a "reasonable cause" determination, the Court should give " '[a]ppropriate deference' to the contentions of the NLRB, and should decline to grant relief only if the [Regional Director's] legal or factual premises are 'fatally flawed.' " *J.R.L. Food Corp.,* 196 F.3d at 335 (quoting *Major League Baseball,* 67 F.3d at 1059). Moreover, "an Administrative Law Judge's factual findings are part of the record and cannot be ignored." *Local 259, United Auto., Aerospace and Agric. Implement Workers of Am. v. NLRB,* 776 F.2d 23, 27 (2d Cir. 1985); *see also J.R.L. Food Corp.,* 196 F.3d at 337–38 (reversing district court's finding of no reasonable cause where the court had rejected many of the ALJ's credibility assessments and factual inferences).[3]

### A. Pratt's Refusal to Reinstate the Employees

Under section 8(a)(1) and (3) of the Act, which precludes an employer from discriminating against its employee in order to "encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3), an employer who refuses to reinstate a striker following an unconditional offer to return to work is guilty of an unfair labor practice unless (1) the striking employee has engaged in a strike that is violative of public policy in its inception, such as when its principle object from the outset is to obtain a contract containing illegal non-economic terms, *see Mackay Radio & Tel. Co.,* 96 NLRB 740, 743 (1951), or (2) the employer can demonstrate a legitimate and substantial busi-

---

3. The Court notes that the ALJ tended to credit the NLRB's witnesses' account of the underlying events. The ALJ found the NLRB witnesses to be "forthright and believable," and their testimony to be "consistent and corroborative ... on critical issues." On the other hand, the ALJ found Pratt's witnesses to be "evasive, guarded and inconsistent of other evidence in the record." *Pratt Towers Inc.,* JD(N.Y.)–64–00, at 45 (Sept. 27, 2000).

ness justification for not reinstating the employee, such as serious employee misconduct or the need to hire permanent replacements. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *see also Waterbury Hosp. v. NLRB*, 950 F.2d 849, 854 (2d Cir.1991) (replacement workers deemed not permanent replacements whose hiring would have excused employer from reinstating strikers); *Newport News Shipbuilding and Dry Dock Co. v. NLRB*, 738 F.2d 1404, 1408 (4th Cir.1984) (serious strike misconduct constitutes justification for denying reinstatement).

Pratt raises both of these justifications for non-reinstatement as affirmative defenses.[4] The Court determines that there exists reasonable cause to believe that the strike was not illegal; that even if the strike were illegal, it was not against public policy in its inception such as to strip the employees of their right to reinstatement; and, finally, independent of the legality of the strike, the employees did not engage in misconduct sufficient to justify Pratt's refusal to reinstate them.

### 1. Illegality of the Strike

Under section 8(b)(4)(ii)(A) of the Act, it is an unfair labor practice for a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—(A) . . . to enter into any agreement which is prohibited by subsection (e) of this section." 29 U.S.C. § 158(b)(4)(ii)(A) (1998). Section 8(e) of the Act, in pertinent part, makes unenforceable and void "any contract or agreement, express or implied, whereby [an] employer ceases or refrains . . . [from] doing business with any other person." 29 U.S.C. § 158(e) (1998). For instance, a "picket line" clause, protecting an employee who refuses to cross a picket line, falls afoul of section 8(e) if it encompasses unlawful secondary picketing. *See General Truck Drivers, Warehousemen and Helpers, Local 467*, 265 NLRB 1679, 1982 WL 24157 (1982), *enforced*, 723 F.2d 915 (9th Cir.1983).

A strike by a union to compel an employer to agree to a provision that would violate section 8(e) constitutes a violation by the union of section 8(b)(4)(ii)(A). *See, e.g., Ironworkers Dist. Cohcil of Pacific Northwest (Hoffman Constr.)*, 292 NLRB 562, 1989 WL 223819 (1989), *enforced*, 913 F.2d 1470 (9th Cir.1990). This does not mean that employees who participate in such a strike automatically forfeit their right to reinstatement. In order to forfeit reinstatement rights, the violation would have to be a principal object of the strike from its inception and, consequently, a violation of public policy. *See Mackay Radio*, 96 NLRB at 743 (strikers who engaged in a strike that from its inception "contravened the public policy, as expressed in the Act" could be discharged). This requires a fact-specific determination. The mere fact that as a consequence of a strike an employer may be coerced to enter into a contract containing a term that would violate section 8(e) is not sufficient to establish that the inclusion of such a term was an "object" of the strike. *See Laborers Int'l Union of North Am.*, 287 NLRB 570, 573, 1987 WL 90093 (1987) (citing *Local 761, Intern. Union of Elec., Radio and Mach. Workers v. NLRB*, 366 U.S. 667, 672–674, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)); *see also International Bhd. of Elec. Workers, Local 480, AFL–CIO v. NLRB*, 413 F.2d 1085, 1090 (D.C.Cir.1969) (it is impermissible to "conclude from the secondary effect of picketing that it had a secondary object").

*Mackay Radio* illustrates the circumstances under which strikers will be deemed to have forfeited their rights under the Act. There, the union had called a strike to compel the employer to accept

---

4. The parties agree that workers hired to replace the employees have the status of temporary replacements.

certain unlawful contract provisions (unlawful union security proposals), which were determined to be "principal objectives throughout the strike," *id.* at 741, and "the record clearly demonstrate[d] the strikers' determination to compel the Respondent to violate the Act." *Id.* at 742 n. 7. Consequently, the strike at issue in *Mackay Radio* was ruled illegal from its inception, and therefore, was not protected by the Act. *See id.* at 740; *compare Mackay Radio with MV Liberator,* 136 NLRB 13, 20, 1962 WL 16051 (1962) (reinstatement ordered where union was not adamant in its demands for union security clause, and such demands were not at any time a major objective of the picketing).

■ Pratt's claim that the object of the strike was to obtain a contract containing illegal non-economic terms—thereby leaving the strikers unprotected under the Act—appears to be both factually and legally unfounded. The allegedly unlawful terms are the "picket line" clause, the "union security" clause, the "evergreen" clause and the "strikes or lockouts" provision.[5] The ALJ, however, found that Pratt failed to show that the Union conditioned reaching an agreement on Pratt's acceptance of any of the allegedly illegal provisions, or that the strike was motivated by some other unlawful objective. Indeed, the January 8, 1999 memorandum from the directors to their fellow coop owners states that the Union intended to strike unless Pratt agreed to its "wage and fringe benefit demands." Pratt's assertion that it refused to reinstate the employees because they participated in an unprotected strike simply does not appear to be credible.

Moreover, even a conclusion that the strike had as an object a contract containing unlawful terms would not strip the employees of their right to reinstatement unless the unlawful term was a principal objective of the strike. The record in this case does not support such a showing.

### 2. Striker Misconduct

■ Section 7 of the Act, *inter alia,* gives employees the right to peacefully strike and picket. *See* 29 U.S.C. § 157. Courts have recognized that Congress must have contemplated "minor acts of misconduct" when it provided for the right to strike under the Act. *See, e.g., Chevron U.S.A. Inc. v. NLRB,* 672 F.2d 359, 360 (3d Cir.1982) (citing *Republic Steel Corp. v. NLRB,* 107 F.2d 472, 479 (3d Cir.1939), *modified on other grounds,* 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940)). However, "serious acts of misconduct which occur in the course of a strike may disqualify a striker from the protection of the Act." *Clear Pine Mouldings,* 268 N.L.R.B. 1044, 1045, (1984), *enforced,* 765 F.2d 148 (9th Cir.1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986). Therefore, refusal to reinstate employees for such misconduct does not constitute an unfair labor practice. *See National Conference of Firemen and Oilers, SEIU, AFL–CIO v. NLRB,* 145 F.3d 380, 384 (D.C.Cir.1998). "Serious strike misconduct, however, is not self-defining." *Newport News Shipbuilding,* 738 F.2d at 1408. In order to rise to this level, the conduct must reasonably tend to coerce or intimidate employees in the exercise of rights

5. The "picket line" clause in the Independent Agreement was the only term at issue in Case No. 29–CC–1285. The ALJ concluded that the clause "clearly violates" section 8(e) of the Act, but found that compelling Pratt to sign an agreement including the clause was not an object of the strike. Pratt vigorously asserted in its brief and at oral argument that the Court should reject the Regional Director's position—that the strike was protected under the Act—because the Regional Director had maintained that the strike was unprotected in Case No. 29–CC–1285. Aside from fallaciously conflating these alternative theories into the proposition that the Regional Director is seeking reinstatement on behalf employees who participated in a strike that was against public policy, Pratt offers no reason why the Court should not give appropriate deference to the Regional Director's position. In any event, the Regional Director has accepted the ALJ's decision in Case No. 29–CC–1285, and is not appealing that decision to the Board.

protected under the Act. *See Clear Pine Mouldings*, 268 NLRB at 1046.

 It is a matter of common sense that some confrontations between strikers and non-strikers are inevitable. Therefore, excluded from the reach of "serious misconduct" is "behavior which may be abusive and uncalled for but which does not reasonably tend to coerce or intimidate." *Newport News Shipbuilding*, 738 F.2d at 1408. However, misconduct by strikers unrelated to the protected activity is unprotected by the Act and need not be condoned. *Compare Sullair P.T.O., Inc. v. NLRB*, 641 F.2d 500 (7th Cir.1981) (employee who called supervisor "a poor fucking manager" did not engage in a protected activity and could be terminated for insubordination), *with NLRB v. Vought Corp.—MLRS Sys. Div.*, 788 F.2d 1378 (8th Cir.1986) (employee who told supervisor, "I'll have your ass," after supervisor issued him a warning in retaliation for employee's union organizing activities, was engaged in a protected activity).

 For purposes of establishing an employer's unlawful motivation, the Supreme Court utilized a two-part test in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). In that case, the Court approved a framework that had been formulated by the Board in *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under this framework, "[i]nitially, the [NLRB] must establish a *prima facie* case that protected conduct was a motivating factor in the employer's decision." *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir.1988). The burden then shifts to the employer to show that it had an honest belief that the employee was guilty of strike misconduct of a serious nature. *See NLRB v. Champ Corp.*, 933 F.2d 688, 700 (9th Cir.1990); *see also Gem Urethane Corp.*, 284 NLRB 1349, 1352 (1987).

 In the present case, it is clear that the Regional Director has met his initial burden of showing that Pratt's refusal to reinstate the striking employees was related to protected activity: Pratt acknowledged in its March 24, 1999 letter to the employees following their requests for reinstatement that the employees were being denied reinstatement, at least in part, because of their alleged strike-related misconduct. The Court, then, turns to the record to determine whether it is likely that Pratt can meet its burden of showing that it had an honest belief that the strikers engaged in serious misconduct.

Despite Pratt's claim that it needed to investigate allegations of striker misconduct prior to offering the employees reinstatement, the employees were terminated without being told what specific acts of misconduct were being alleged, or given an opportunity to respond to the accusations. Furthermore, the minutes of the March 16, 1999 directors meeting reflect that the employees' behavior during the strike had been good. McGill, in fact, said that he had been "impressed" with the strikers' behavior in comparison to other strike situations he had observed. Moreover, Johnson admitted that three employees, Bailey, Folkes and Obaseki, had not engaged in misconduct. Finally, the ALJ deemed the specific allegations against Venzen, Brailsford and Robinson to be either unsubstantiated or not serious enough to support denial of reinstatement. The Court's review of the record leads it to conclude that Pratt's affirmative defense of striker misconduct is without merit.

**B. Pratt's Refusal to Bargain in Good Faith with the Union**

The Regional Director further alleges that Pratt violated section 8(a)(1) and (5) of the Act by refusing to bargain in good faith with the Union. *See* 29 U.S.C. § 158(a)(5), (d) (requiring an employer to bargain in good faith with its employees' representative). This requirement includes the obligation to "confer in good

faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). Because the duty to bargain in good faith extends to each and every subject embraced within this statutory phrase, it is an unfair labor practice for an employer to refuse to bargain about such subjects. *NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). It has long been understood that "the purpose of collective bargaining is to produce an agreement and not merely to engage in talk for the sake of going through the motions." *Herbert Harvey, Inc. v. NLRB,* 424 F.2d 770, 775 (D.C.Cir. 1969) (quoting *Westinghouse Elec. Corp. v. NLRB,* 387 F.2d 542, 550 (4th Cir.1967) (en banc)).

 The record and the ALJ's findings fully support the Regional Director's position. As the minutes of the directors meeting repeatedly reflect, Pratt conducted its relationship with the Union with the object of stalling negotiations until the end of the certification year. Pratt hoped that the employees would either abandon the Union or vote for decertification. These facts give the Court reasonable cause to believe that Pratt violated section 8(a)(1) and (5) of the Act.

## II. Just and Proper

 Injunctive relief under section 10(j) is just and proper when serious and pervasive unfair labor practices threaten the effectiveness of the NLRB's final remedy; where interim relief is the only effective means to preserve or restore the *status quo* as it existed before the violations, and where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under legal restraint. *See Kaynard v. Mego Corp.,* 633 F.2d 1026, 1033–34 (2d Cir.1980). Pratt's actions have left the employees without employment, medical benefits or effective representation. The passage of time appears to have already

eroded the Union's membership, thereby jeopardizing the effectiveness of a final remedy.[6]

 Pratt questions whether injunctive relief is just and proper given the Regional Director's delay in filing the subject petition. Delay, however, should not be taken into consideration unless between the alleged unfair labor practices and the filing of the petition circumstances have changed that affect the appropriateness of such relief. *See Dunbar v. Carrier Corp.,* 66 F.Supp.2d 346, 354 (N.D.N.Y.1999) (citing *NLRB v. Quinn Restaurant Corp.,* 14 F.3d 811, 816 (2d Cir.1994)); *see also Sharp v. Webco Indus., Inc.,* 225 F.3d 1130, 1136 (10th Cir.2000) (delay is only significant if the parties cannot be returned to the *status quo,* or the NLRB's final order is likely to be as effective as interim relief). Moreover, absent a showing that interim relief would be ineffective, it is inappropriate to punish employees for the Regional Director's delay. *See Carrier Corp.,* 66 F.Supp.2d at 354.

Pratt argues that the Regional Director's delay compromises the necessity for injunctive relief, and that it would be disruptive to Pratt's operations if, assuming the Board declined to adopt the ALJ's recommended order with regard to reinstatement, Pratt again had to discharge the employees. In this latter regard, Pratt has made no showing that the relief requested by the Regional Director would not restore the *status quo.* Although rejection of the ALJ's determinations, assuming the Board rules in Pratt's favor, would give Pratt the right to discharge the reinstated employees, Pratt would suffer no prejudice because the decision to retain the employees would be Pratt's choice.

As for the alleged delay, Petitioner submitted as Petitioner's Exhibit 1 at oral argument a chronology of his related activities from the date the original underlying charges were filed. Pratt did not object to

**6.** Obeski declined Pratt's offer of reinstatement because he had moved to Texas. *See* October 15, 2000 letter from McGill to the Court at 5.

the chronology. It demonstrates that the Regional Director has prosecuted the underlying NLRB cases with reasonable diligence, and that his 10(j) petition was timely. In light of the foregoing, the Court finds that, absent injunctive relief, the employees' ability to organize may be significantly curtailed while the NLRB's final determination is pending. The Regional Director's request for injunctive relief is, therefore, just and proper.

## CONCLUSION

For the foregoing reasons, petitioner's request for injunctive relief is granted. Respondent is ordered (1) to recognize and, upon request, bargain in good faith with the Union as the employees' exclusive collective bargaining representative; (2) to offer immediate interim reinstatement to the employees to their former positions of employment, together with the wages, benefits and other working conditions they enjoyed; (3) to post at its facility, until the NLRB issues its opinion and order, in locations where notices are customarily posted, copies of this Memorandum and Order, and grant agents of the NLRB reasonable access to the building to monitor the posting; and (4) within twenty days of the date of this Memorandum and Order, to provide the Court and the Regional Director with an affidavit from a corporate official stating with specificity the manner in which respondent has complied with the Court's order, including how the documents have been posted as required by this Court. Any workers hired or reassigned to replace the striking employees shall be displaced if necessary.

**SO ORDERED.**