**Cornele A. OVERSTREET, Regional Director of Region 28 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**EL PASO DISPOSAL, L.P., Respondent.**

**No. EP–09–CV–275–DB.**

United States District Court, W.D. Texas, El Paso Division.

Oct. 30, 2009.

of Subject Matter Jurisdiction" and supporting Brief, filed on August 14, 2009. On August 17, 2009, Petitioner filed an Opposition to the Motion to Dismiss. After due consideration, the Court is of the opinion that the Motion to Dismiss should be denied and the instant Petition should be granted for the reasons that follow.

David A. Kelly, John T. Giannopoulos, Mara–Louise Anzalone, Michael J. Karlson, National Labor Relations Board, Phoenix, AZ, for Petitioner.

Mark R. Flora, Constangy, Brooks & Smith, LLC, Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER

DAVID BRIONES, Senior District Judge.

On this day, the Court considered Petitioner Cornele A. Overstreet's "Petition for Temporary Injunction Pursuant to Section 10(j) of the National Labor Relations Act, as Amended [29 U.S.C. Section 160(j) ]," filed in the above-captioned cause on July 27, 2009.[1] On July 27, 2009, Petitioner also submitted a Memorandum of Points and Authorities. On August 14, 2009, Respondent El Paso Disposal, L.P. responded to the Petition by filing a Memorandum of Points and Authorities, to which Petitioner filed a Reply Brief on August 17, 2009. On August 19, 2009, the Court held a hearing on the Petition at which counsel for both Parties presented oral argument. The Court also considered Respondent's "Motion to Dismiss for Lack

1. On July 31, 2009, the Court entered an Order providing the Parties with a hearing date of August 19, 2009, and multiple deadlines, with which the Parties complied.

2. On October 12, 2006, Darrell Chambliss ("Chambliss"), Chief Operating Officer for

### BACKGROUND

The instant case involves alleged unfair labor practices by Respondent, occurring during the bargaining of a first contract, leading to a strike, and resulting in alleged ongoing unfair labor practices. Respondent, a wholly-owned subsidiary of Waste Connections, Inc. ("Waste Connections"), is a garbage collection and disposal company incorporated in the State of Texas with a place of business in El Paso, Texas. On September 28, 2006, the International Union of Operating Engineers, Local 351, AFL–CIO ("the Union"), was certified by the National Labor Relations Board ("NLRB" or "Board") as the exclusive bargaining representative for Respondent's Maintenance Unit employees. On October 12, 2006, the NLRB also certified the Union as the exclusive bargaining representative for Respondent's Drivers Unit employees. The Union's Business Agent, Victor Aguirre ("Aguirre"), oversaw the Union's organizing drive.

On October 2, 2006, after the employees voted for the Union, Aguirre sent George Wayne ("Wayne")—a Waste Connections management official responsible for Respondent—two letters: the first demanded that Respondent bargain with the Maintenance Unit, and the second made various information requests.[2] The first negotiat-

Waste Connections indicated that Respondent's officials were reviewing their calendars to schedule negotiations and that Chambliss would respond to the Union's information requests as soon as practical. Chambliss later informed Aguirre that Respondent was

ing session occurred on January 30, 2007. During the thirteen-and-a-half months between Aguirre's first request for bargaining and the strike on November 21, 2007, the parties held fourteen bargaining sessions. Typically, these sessions began at 9:00 a.m., broke for an hour-and-a-half lunch, and ended at 3:00 p.m. or 4:00 p.m., resulting in approximately five hours of bargaining per session. Respondent's bargaining committee consisted of Attorney Mark Flora ("Flora"), Wayne, and Gene Dupreau ("Dupreau"), another Waste Connections management official. While only Flora spoke on behalf of Respondent, he did not have the authority to enter into agreements with the Union without Wayne and Dupreau present. As such, either Wayne or Dupreau had to be present at the bargaining sessions with Flora, resulting in scheduling difficulties.[3]

With regards to the substance of the bargaining sessions, the parties agreed that they would first bargain concerning the Maintenance Unit, addressing non-economic issues first. Throughout the spring and summer, the parties passed proposals and signed tentative agreements on non-

economic articles. As of August 9, 2007, only four non-economic provisions were left to be resolved: Grievance/Arbitration, No Strike/No Lockout, Management Rights, and Dues Check–Off. The Union had proposed a Dues Check–Off authorization clause[4] during the first bargaining session on January 30, 2007. At the session of May 22, 2007, the Union offered to accept the Management Rights clause if Respondent accepted the Union's Dues Check–Off clause. The Union made this offer again on May 31, 2007, but Respondent rejected it without any explanation. Respondent never submitted a written counterproposal to the Union on this issue.

At the meeting on September 11, 2007, Aguirre informed Respondents that the Union members had voted unanimously to strike.[5] The parties decided to table the last four unresolved non-economic items and to turn to the Union's economic proposals. At the meeting on October 4, 2007, the parties continued to discuss the Union's economic proposals, including the cost effect of the Union's benefit and wage proposals. The parties agreed that

interviewing new counsel, as its previous counsel accepted a judicial appointment. On November 28, 2006, Attorney Mark Flora ("Flora") emailed Aguirre, introducing himself as Respondent's new counsel and requesting that Aguirre contact him about scheduling. Aguirre did so, and Flora, Aguirre, and Juan De La Torre ("De La Torre")—another Union representative—had an introductory meeting on December 14, 2006.

3. For example, on February 13, 2007, Aguirre emailed Flora thirty-five dates on which the Union could bargain in March and April 2007. On February 19, 2007, Flora responded that he could meet on two of those days: March 22 and April 10, 2007. The Union agreed to those days. The parties were scheduled thereafter to meet on April 17, 2007, but Respondent canceled because Wayne was called for jury duty. Respondent informed the Union that they would be available to meet on May 22 and 31, 2007, to

which Aguirre responded, "We need to speed things up. Let's plan to meet longer and have more days at once." Aguirre also indicated that some Union members were getting impatient and contemplating disruptive behavior such as a strike.

4. The Dues Check–Off provision would require Respondent, upon the employee's authorization, to deduct Union initiation fees and uniform monthly dues from the employee's pay.

5. On September 8, 2007, Aguirre had a general meeting with employees in the Maintenance and Drivers Units. At that meeting, members expressed frustration with the length of time the negotiation process was taking. Much of the discussion focused on Respondent's failure to "budg[e] for anything that the Union had to say." The employees authorized the negotiating committee to decide whether to call a strike.

Dupreau would meet with employees in an attempt to better understand the employees' problems and needs. On October 11, 2007, Dupreau met with employees individually and asked a set of prepared questions. These questions addressed the employee's concerns and desires, what Respondent could do better, what the employee expected from the Union, and whether the Union had done anything to date. In response, Dupreau told certain employees that he would fix the problems between Respondent and his employees and that he would consult with supervisors about employees' concerns.[6]

Meanwhile, Respondent made work policy changes without bargaining with the Union. For instance, on January 1, 2007, Armando Lopez ("Lopez"), who had supervisory authority over Respondent's Fleet Maintenance employees, issued a memorandum requiring employees to provide a doctor's note if they used one day of sick leave after a specified holiday. Lopez never provided the Union notice or an opportunity to bargain about this change in sick leave policy.[7] In June 2007, Respondent transferred Juan Vasquez ("Vasquez"), a tractor/trailer truck driver, to a roll-off driver position and changed his pay rate from hourly to incentive. Francisco Gonzalez ("Gonzalez") took over Vasquez's previous duties, and Respondent raised Gonzalez's salary by $0.75 due to his increased responsibilities. Respondent did not discuss this change and wage increase with the Union in advance. Finally, Respondent did not give employee Jesus Duran a watch for his ten years of service on his ten-year anniversary, as was Respondent's previous longevity bonus practice.

At the next meeting on October 12, 2007, the parties discussed the Union's wage proposal, and Respondent felt that enough progress had been made to present a last, best, and final offer at the next meeting. Aguirre disagreed that the parties were at this step, noting that they had yet to negotiate the Dues Check–Off provision or come to an agreement on the Grievance/Arbitration provision. Aguirre later emailed Flora a request for a copy of Respondent's final offer, but Flora stated that Respondent wanted to present the offer at the actual bargaining session.

On November 13, 2007, Respondent passed its last, best, and final offer. The offer consisted of thirty-two contract articles, of which the parties had previously agreed to twenty-three. The outstanding proposals included those on Management Rights, Holidays, Sick Leave, Uniforms, Fringe Benefits, Grievance/Arbitration, No Strike/No Lockout, Wage Increases, and Longevity Bonuses.[8] Respondent's last, best, and final offer included a Managements Rights article granting Respondent discretion in creating workplace rules and regulations; in disciplining, discharging, and laying off employees; and in subcontracting work. The offer did not include a Dues Check–Off provision. At the meeting, the Union left the room while Pete Cinquemani ("Cinquemani"), a federal mediator, summarized the status of the nego-

---

6. In Administrative Law Judge Burton Litvack's ("ALJ Litvack") Decision issued on April 27, 2009, he found that Dupreau's actions violated section 8(a)(1) of the National Labor Relations Act ("Act") by coercively interrogating employees and soliciting grievances from employees and promising to remedy them. ALJ Litvack did not find, however, that Dupreau's actions violated the Act by bypassing the Union and dealing directly with employees.

7. Lopez had issued a similar memorandum on July 1, 2004, although at that time he did not have supervisory authority over Respondent's Fleet Maintenance employees. Lopez issued a similar memorandum again on January 8, 2008.

8. The parties had negotiated wages during two meetings but never negotiated longevity bonuses.

tiations. Cinquemani reviewed the open wage and benefit articles with Respondent and then met with the Union. Cinquemani returned to Respondent with the Union's demand of five days of sick leave annually, a 365-day cap on back pay for the Grievance/Arbitration clause, a Dues Check-Off provision, an immediate ratification bonus of $1000, and a 5 percent wage increase in the first and second years of the contract. Respondent countered by offering the Union the requested five days of sick leave and increasing the back-pay cap to 150 days. Cinquemani spoke with the Union and then indicated to Respondent that there would not be an agreement.

On November 13, 2007, the Union held a general meeting with employees in the Maintenance and Drivers Units after the bargaining session. At the meeting, Aguirre spoke about the contract negotiations, stating that Respondent "wasn't willing to budge for anything that [the Union] would propose." Aguirre told the members that the Union had made numerous concessions but had not seen any sign from Respondent that they were bargaining in good faith. Aguirre also told employees that the Union would file unfair labor practice charges against Respondent.[9] Aguirre explained the difference between an economic strike and an unfair labor practice strike and told the employees that he believed their strike would be an unfair labor practice strike. The Union voted unanimously to strike. Employees had various reasons for going on strike.

Some cited "mistreatment [they] received from the supervisors," having to pick up medical waste, workplace safety issues, and discrimination. Others referred to the lack of progress that was being made in the negotiations between the Union and the company.[10]

Also on November 13, 2007, after the bargaining session, the Union sent Respondent a thirty-three-page long information request with many sub-parts. In the first paragraph, the Union requested a list of current employees' names, dates of hire, wage rates, job classifications, last known addresses, and phone numbers. Respondent replied that the requested information was provided on October 20, 2006, over a year earlier.[11]

On November 14, 2007, Respondent held a mandatory meeting at 4 a.m. for its drivers at which three management representatives but no Union representatives were present. Wayne and Dupreau explained Respondent's proposals using a summary of the last, best, final offer for the Maintenance Unit. They told the drivers that Respondent would not change or engage in further bargaining regarding any aspect of this offer. The drivers asked why Wayne and Dupreau were explaining the Maintenance Unit's contract to them, and Wayne and Dupreau responded that the contract was for both Units and that if they "didn't like it, there was the door." Wayne and Dupreau also told the drivers that if any of them joined the maintenance employees in a strike, they

---

**9.** The Union filed its first unfair labor practice charge against Respondent on November 14, 2007. *See infra* 12 n. 23.

**10.** ALJ Litvack found that the employees' decision to strike was motivated by their impression that there had been no progress in the negotiations and that negotiations were taking too much time. ALJ Litvack also found that the strike was an unfair labor practice strike.

**11.** Respondent communicated to the Union that it thought the information request was untimely and overly broad. While the Union requested a response to its lengthy request by November 27, 2007, Respondent ultimately responded on January 30, 2008, often stating that the requested information was previously provided or was overly broad and burdensome.

would all be permanently replaced. One employee asked how drivers could get rid of the Union, and Wayne replied that there are ways of doing it, such as signing a petition and voting the Union out.[12]

On November 20, 2007, the day before the strike, Mike Olivas ("Olivas"), Respondent's Maintenance Manager, called a meeting of the Maintenance Unit employees. He informed them that, in the event of a strike, Respondent had at least fourteen specialized mechanics on call to replace them and had purchased tools for the replacements to use. Olivas told the employees that, if they joined the strike, they should consider themselves as having been fired.[13]

The strike began at 12:01 a.m. on November 21, 2007. Fifty-five workers in both Units joined in the strike,[14] manning a picket line in front of Respondent's facility. The strikers displayed picket signs with written messages such as "Please support our ULP strike against El Paso Disposal" and "On Strike over Unfair Labor Practices." Wayne asked one of Respondent's salesmen, Troy Roberts ("Roberts"), to photograph the strikers. Roberts downloaded the photographs he took, which showed various strikers' identities, and gave them to Wayne.[15] On November 22, 2007, Olivas telephoned the El Paso Police Department and requested that officers be dispatched to the location of the picketing. Olivas had received reports from drivers that strikers were using their picketing signs to obstruct drivers' vision as they entered and exited the facility. Wayne instructed the officers to speak to the strikers about not crossing Respondent's property line.[16]

Respondent began hiring replacement employees on November 21, 2007, and had

12. ALJ Litvack found that Respondent violated the Act by threatening to engage in regressive bargaining, bargaining with the drivers without the Union present, and threatening to replace workers who strike.

13. ALJ Litvack found that Olivas' actions here did not threaten employees by conveying the inevitability of the strike and therefore did not violate section 8(a)(1) of the Act.

14. Just prior to the strike, Respondent employed sixty-five employees in the Drivers Unit and thirty-four employees in the Maintenance Unit. On November 21, 2007, twenty-eight drivers and twenty-seven maintenance employees went on strike.

Respondent included Juan Macias ("Macias") and Jose Castillo ("Castillo") among the list of replaced strikers, listing them as being replaced on November 22 and 23, 2007, respectively. When the strike began, Macias was on vacation, and Castillo was out on workers' compensation. Macias reported to work after his vacation and saw the striking workers outside of the facility. Macias spoke to Grade Silva ("Silva") in the human resources department who told him that he had been permanently replaced and that he

should sign the preferential recall list. In December 2007 or January 2008, Olivas informed Castillo that he had been permanently replaced. On January 8, 2008, after Castillo received a full release to work, Silva wrote to Castillo offering him a position as a welder at the same pay and benefits. On February 5, 2008, Silva wrote to Castillo again, having received no answer. On March 5, 2008, Castillo wrote Silva and rejected the offer, asserting that Olivas had told him that he had been permanently replaced. On March 24, 2008, Silva sent Castillo a letter terminating his employment effective March 10, 2008. ALJ Litvack found that Respondent violated section 8(a)(1) and (3) of the Act by wrongfully terminating Macias and by permanently replacing Castillo and failing to reinstate him upon the Union's unconditional offer to return to work.

15. ALJ Litvack found that Respondent's photographing of the strikers violated section 8(a)(1) of the Act.

16. ALJ Litvack found that Respondent's sole purpose for summoning the police was to harass the strikers and, as such, violated section 8(a)(1) of the Act.

a full complement of replacements within one week.[17] On December 4, 2007, the Union made an unconditional offer to return to work on behalf of the striking employees from both Units. On December 5, 2007, Respondent informed the Union that Respondent considered the strike to be an economic strike, that all strikers had been permanently replaced, and that no vacancies existed. Respondent instructed the Union to inform the strikers to report to Respondent's human resources department to sign a preferential hiring list indicating their desire to be reinstated. Fifty-two of the strikers signed the preferential hiring list. In mid-December 2007, fifty drivers signed a petition declaring that they no longer wished to be represented by the Union ("December 2007 disavowal petition").[18]

As of mid-May 2008, five permanent replacements in mechanic positions had left their jobs, but Respondent had only recalled two mechanics from the preferential recall list. As of May 22, 2008, two replacements working as welders had left their jobs, but no striker was recalled to fill these positions.[19] Respondent hired fifteen extra drivers to replace strikers and has since discharged fifteen drivers without filling those positions. When Respondent did recall strikers from the preferential hire list, strikers were required to fill out paperwork as if they were new hires. For instance, in late October 2008, Respondent offered strikers Victor Flores ("Flores") and Arturo Gasca ("Gasca")—who had both been front-load drivers—positions as roll-off drivers.[20] Respondent offered Flores a wage of $12, which was less than he was previously paid. Respondent's Operations Manager, Alfredo R. Minjares, Jr. ("Minjares"), told Flores he could accept the roll-off driver position or

**17.** Respondent mailed the strikers their final pre-strike paychecks rather than directly depositing them. ALJ Litvack found that this change in payment policy, while not unlawful in and of itself, was motivated by retaliatory intentions. As such, ALJ Litvack found that Respondent violated section 8(a)(1) and (3) of the Act by acting in retaliation against its striking employees.

**18.** ALJ Litvack found that a causal connection existed between unfair labor practices and the December 2007 disavowal petition. As such, ALJ Litvack recommended that the Board dismiss the December 2007 disavowal petition.

**19.** Respondent explains that the replacement employees were not as efficient as the experienced strikers and also that business declined in 2008. Thus, Respondent did not need to fill those positions immediately.

On November 21, 2007, after the strike had begun, the Union submitted an information request to Respondent seeking the names and addresses of the employees currently performing the bargaining Units' work and other information. On November 30, 2007, Respondent provided the Union a list indicating the first name and last initial of the replacement workers that Respondent deemed were permanent, their dates of hire, wage rates, and the names of the striking employee and position they were taking. Respondent never gave the Union the full names of the replacement workers, asserting that Respondent was concerned for the safety of the replacements and that some had been verbally hassled. Respondent offered to provide the full names and addresses of the permanent replacements if Aguirre agreed to not disclose this information beyond the Union leadership and the Union attorney, but Aguirre never responded or signed the Nondisclosure Agreement. ALJ Litvack noted that Respondent's concerns about replacement workers' safety were unfounded, as Respondent did not provide any evidence connecting the Union with any of the allegations of harassment.

**20.** A roll-off truck pulls cans with a cable from the back side of the truck, while a front-loader truck picks cans up from the front. Each type of truck requires different training and has separate routes and schedules. Gasca indicated to Operations Manager, Alfredo R. Minjares, Jr. ("Minjares") that he would need training to be a roll-off driver, but Minjares responded that he knew Gasca could do it without training.

resign. Minjares then directed Flores to Silva, who made him complete new hire paperwork, including a physical and drug test. When Flores decided not to take the position, Silva had him complete a Separation Notice and exit interview. When Gasca came to speak to Minjares about the position, he was told that he could not use the employee entrance and parking lot. After Minjares discussed the offered position with Gasca, Silva had Gasca complete new hire paperwork and drug testing. When Gasca decided not to take the position, Silva had him complete a Separation Notice and exit interview. Further, Respondent did not give Gasca his fifteen-year longevity bonus—a certificate of appreciation and a check for $2000—which came due on May 3, 2008. Both Flores and Gasca were offered positions out of order from the preferential hire list.[21]

On or about December 15, 2008, Respondent was presented with three petitions, all dated in late November 2008, disavowing interest in continued representation by the Union ("November 2008 disavowal petitions"). The first contained fifty-one signatures from the Drivers Unit, thirty-five of whom had signed the December 2007 disavowal petition. The second and third petitions contained a total of twenty-seven

signatures from the Maintenance Unit. The November 2008 disavowal petitions had signatures from a majority of employees in both Units.[22] On December 20, 2008, driver Paul Urbina filed a decertification petition with the NLRB seeking to decertify the Union as the exclusive bargaining representative for the Drivers Unit. On January 7, 2009, Wayne sent De La Torre a letter advising the Union that Respondent had been presented with "petitions signed by a substantial majority of the employees in each bargaining unit indicating that they no longer wish to be represented by the Union" and that Respondent "hereby withdraws recognition of the Union in both units effective immediately."

In March 2009, Respondent granted the first wage increase any employee in the bargaining Units had received in three years. Incentive-based drivers and all non-strikers and recalled strikers received a 6.2 percent wage increase. Hourly replacement drivers received a 3.2 percent increase. Respondent did not notify the Union prior to granting this increase nor did Respondent afford the Union an opportunity to bargain about the decision.

On April 27, 2009, Administrative Law Judge ("ALJ") Burton Litvack ("ALJ Litvack") issued a decision regarding six charges filed with the NLRB from November 14, 2007, through March 6, 2008.[23]

21. Among the front-load drivers to be recalled, Gasca was ranked fourth and Flores eighth. The front-load drivers ranked fifth through seventh had not been recalled yet. Of the ten roll-off drivers on the recall list, the fourth and sixth had not been recalled at the time positions were offered to Flores and Gasca.

22. As of December 2008, Respondent had sixty active drivers and seventeen inactive drivers on the preferential rehire list. Respondent also had thirty-one active maintenance employees and twenty-two inactive maintenance employees on the preferential rehire list.

23. The Union filed charges with the NLRB on November 14, November 21, November 23,

November 30, and December 3, 2007, and March 6, 2008. The first charge alleges that Respondent unilaterally changed its longevity bonus policy, told employees that Respondent had fourteen employees to replace them, told employees that Respondent was offering the Union its best offer but that the Union did not want to negotiate, and directly dealt with employees. The second charge alleges that Respondent threatened and intimidated employees on strike by posting a sign for hiring employees, taking pictures of strikers, and calling the police. The third charge alleges that Respondent failed to provide to the Union pertinent information it requested. The fourth charge alleges that Respondent unilaterally changed its payroll payment policy, thereby delaying payment of wages. The fifth

ALJ Litvack agreed with a majority of Plaintiff's allegations, finding that Respondent violated the Act in many ways. Particularly, ALJ Litvack found that Respondent engaged in bad faith bargaining and dilatory negotiation practices. Further, ALJ Litvack recommended that the Board find that the strike was an unfair labor practice strike and that the December 2007 disavowal petition was tainted by Respondent's unfair labor practices. On August 25 and 26, 2009, ALJ William G. Kocol ("ALJ Kocol") heard testimony on three subsequent charges filed with the NLRB from November 25, 2008, through March 23, 2009.[24] The instant Petition is considered solely based on the Parties' briefs and oral argument and the record developed before the ALJs.

## DISCUSSION

The instant case arises under section 10(j) of the National Labor Relations Act ("Act"). Section 10(j) provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper. 29 U.S.C.A. § 160(j) (West 1998).

Section 10(j) relief preserves the Board's ability to provide effective relief to parties upon resolving a case. This is necessary because many years may pass between the filing of an initial complaint with the NLRB and the Board's issuance of an ultimate decision. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188 (5th Cir.1975). Once a complaint is filed, an ALJ holds a hearing on the complaint and prepares a decision containing findings of fact, conclusions, and recommendations as to the disposition of the case. 29 C.F.R. §§ 102.35, 102.45 (2009). The ALJ's decision, however, is not enforceable. *See* 29 C.F.R. § 102.45. Only the Board, after either adopting or rejecting the ALJ's decision, can accord relief. 29 C.F.R. § 102.48 (2009). Further, anyone aggrieved by the Board's final order can obtain review of the order in a United States court of appeals. 29 U.S.C.A. § 160(f). As a result, circumstances may have changed to such a degree by the time the Board issues a decision that the Board may not be able to order any relief that effectively would remedy the unfair labor practices. *See Pilot Freight Carriers, Inc.*, 515 F.2d at 1193; *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir.1996). Accordingly, to pre-

charge alleges that Respondent refused to reinstate unfair labor practice strikers despite their unconditional offer to return. The sixth charge alleges that Respondent engaged in surface bargaining and bargained in bad faith for six months, beginning on September 2007. ALJ Litvack held hearings on these charges on May 28–30, June 17–19, and July 15–17, 2008.

**24.** The Union filed subsequent charges with the NLRB on November 25, 2008, and January 8 and March 23, 2009. These charges allege that Respondent did not honor the preferential rehire list by offering strikers different positions, improperly withdrew recognition of the Union, and increased wages without giving the Union notice and opportunity to bargain. ALJ William G. Kocol held a hearing on these charges, and others not raised in the instant Petition, on August 25 and 26, 2009.

serve the lawful status quo—the status quo that existed before an employer's unfair labor practices ("status quo *ante* ")—Congress accorded the Board the authority to seek a temporary injunction pursuant to section 10(j).

As Respondent's Motion to Dismiss attacks the Court's ability to make any determination on the Petition, the Court addresses the Motion to Dismiss before turning to the Petition.

## I. Motion to Dismiss

In its Motion to Dismiss, Respondent argues that the instant Petition was not properly brought under section 10(j) and that the Court, therefore, lacks subject matter jurisdiction to hear the Petition. Respondent first contends that the Board impermissibly delegated to the General Counsel the authority to seek section 10(j) relief. Second, Respondent asserts that the Petition was unlawfully filed because the Board lacked a quorum at the time of filing. Petitioner responds that the Board's delegation of section 10(j) authority to the General Counsel is permitted by section 3(d) of the Act. Further, Petitioner argues that this delegation did not expire when the Board was reduced to two members. The Court agrees with Petitioner.

Since Respondent's arguments question the NLRB's interpretation of its statutory authority, the Court will apply the two-step inquiry outlined in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. ("Chevron").* See 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Med. Ctr. Pharm. v. Mukasey,* 536 F.3d 383, 393 (5th Cir.2008). Under *Chevron,* a court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. In doing so, a court employs "traditional tools of statutory construction." *Id.* at 843 n. 9, 104 S.Ct. 2778. If a court determines that Congress direct-

ly spoke to the precise question at issue, then the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If not, then the court must proceed to the second *Chevron* step and defer to any "permissible construction of the statute" by the agency. *Id.* Notably, a permissible construction is not necessarily the only one that the agency could have adopted or the one that the Court would have reached if the question initially had arisen in a judicial proceeding. *Id.* at 843 n. 11, 104 S.Ct. 2778. The Court applies the *Chevron* approach in addressing both the section 10(j) delegation and the effect of the Board's quorum on that delegation.

### A. Delegation of Section 10(j) Authority to the General Counsel

■ The Court first considers whether the Board's delegation of its section 10(j) power to the General Counsel is permissible. Respondent argues that, since section 3(b) specifically states two instances in which the Board may delegate its power and does not mention the Board's power to seek section 10(j) relief, the Board cannot delegate its section 10(j) power. Petitioner responds that section 10(j) relief is a prosecutorial duty that the Board can properly delegate to the General Counsel pursuant to section 3(d). The Court agrees with Petitioner.

On December 20, 2007, the Board delegated its section 10(j) authority to the General Counsel, effective December 28, 2007. Section 3(b) specifically authorizes the Board "to delegate to any group of three or more members any or all of the powers which it may itself exercise." 29 U.S.C.A. § 153(b) (West 1998). The Board "is also authorized to delegate to its regional directors its powers under" 29 U.S.C. § 159 to complete certain activities pertaining to union representation and elections. § 153(b); *see* 29 U.S.C. § 159

(West 1998). Section 3(d) provides for a General Counsel of the Board and delineates the General Counsel's powers and duties. § 153(d). The General Counsel has final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under [29 U.S.C. § 160], and in respect of the prosecution of such complaints before the Board, and *shall have such other duties as the Board may prescribe* or as may be provided by law. § 153(d) (emphasis added).

First, the Court determines whether Congress has directly spoken to the question at issue. *See Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The Board cannot assign away its core adjudicative functions unless expressly permitted by statute. *See Muffley v. Spartan Mining Co.,* 570 F.3d 534, 540 (4th Cir.2009); *Flav-O-Rich, Inc. v. NLRB,* 531 F.2d 358, 363–64 (6th Cir.1976); *KFC Nat'l Mgmt. Corp. v. NLRB,* 497 F.2d 298, 303, 306–07 (2d Cir. 1974). Section 3(b) lists two instances in which the Board may delegate its authority: (1) delegation to a smaller group of Board members "all of the powers which [the Board] may itself exercise," and (2) delegation to regional directors of the Board's authority under § 159. § 153(b). The first is clearly adjudicatory. The second relates to core Board functions such as determining a bargaining unit, finding whether a question of representation affecting commerce exists, and directing an election. *See* §§ 153(b), 159(b), (c)(1). If not for the express language in the statute, the Board would not have the power to delegate these core adjudicatory duties. *See Muffley,* 570 F.3d at 540.

Neither of these section 3(b) delegations involve prosecutorial functions, which the Board can assign to the General Counsel pursuant to section 3(d). § 153(d). Duties that the Board has assigned to the General Counsel in the past include the right to appeal from a Board's refusal to issue a complaint and the final authority to review a regional director's determination of whether to institute a section 10(1) proceeding. 29 C.F.R. § 102.19(a) (2009); *Terminal Freight Handling Co. v. Solien,* 444 F.2d 699, 703 (8th Cir.1971). Thus, the Act clearly allows prosecutorial functions to be delegated to the General Counsel while adjudicatory functions must remain with the Board unless Congress created a specific exception. The question the Court must now consider is whether section 10(j) authority is adjudicatory or prosecutorial.

Section 10(j) accords the Board the power to petition a district court for appropriate temporary relief or a restraining order. The Board need not make any finding to request section 10(j) relief, nor does the grant or denial of section 10(j) relief by the district court determine the outcome of the case pending before the Board. *See* 29 U.S.C.A. § 160(j). Thus, in requesting section 10(j) relief, the Board does not adjudicate anything. Rather, section 10(j) relief ensures that *prosecution* will result in an effective remedy. As such, requesting section 10(j) relief is a prosecutorial tool and not an adjudicative function that the Board is prohibited from delegating. Therefore, the Board can delegate the authority to request section 10(j) relief to the General Counsel pursuant to section 3(d).[25]

---

**25.** Indeed, "every court that has addressed this issue has found that § 3(d) permits the Board to delegate to the General Counsel its power to seek § 10(j) relief." *Muffley v. Spartan Mining Co.,* 570 F.3d 534, 540 (4th Cir. 2009). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") found the ability to seek section 10(j) relief to be "clearly prosecutorial," as *"seeking* § 10(j) relief from a district court adjudicates nothing." *Id.* at 540 (emphasis included). Other courts have similarly found section 10(j) to be prosecutorial, not adjudicatory, and therefore properly delegated to the General Counsel.

Further, Congress expressed its intent to allow section 10(j) relief to be delegated to the General Counsel by not amending the pertinent language of section 3(d) despite previous cases affirming such a delegation. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change...." *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). The Board first delegated its authority to seek section 10(j) relief in 1947.[26] Courts approved of this delegation of authority. *Penello v. Int'l Union, United Mine Workers of Am.,* 88 F.Supp. 935, 937 (D.D.C.1950); *Evans v. Int'l Typographical Union,* 76 F.Supp. 881, 889 (S.D.Ind.1948); *Madden v. Int'l Union, United Mine Workers of Am.,* 79 F.Supp. 616, 622 (D.D.C.1948). In 1959 and 1978, Congress amended section 3(d) but did not alter the relevant portions of section 3(d). *See* Pub.L. 95–251, 92 Stat. 183 (1978); Pub.L. 86–257, 73 Stat. 519 (1959). Congress thereby agreed that section 3(d) permits the Board to delegate to the General Counsel its section 10(j) authority. *See Lorillard,* 434 U.S. at 580, 98 S.Ct. 866. Since Congress's intent with regards to this precise issue is clear, the Court must give effect to Congress's intent and need not consider the reasonableness of the Board's interpretation of the Act. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Therefore, the Board's delegation to the General Counsel of its section 10(j) authority is permissible.

### B. Effect of the Board's Quorum

■ Next, Respondent argues that the Board did not authorize the filing of the

*See Glasser v. Heartland—Univ. of Livonia, MI, LLC,* 632 F.Supp.2d 659, 662 (E.D.Mich. 2009); *Kentov v. Point Blank Body Armor, Inc.,* 258 F.Supp.2d 1325, 1328 (S.D.Fla. 2002); *Evans v. Int'l Typographical Union,* 76 F.Supp. 881, 889 (S.D.Ind.1948).

Petition because it lacked the quorum to do so. Further, assuming the Board's delegation of section 10(j) authority was initially permissible, Respondent contends that this delegation of authority expired when the Board shrunk to two members. Petitioner responds that the Board satisfies the quorum requirement with two members and that, even if it does not, the Board's delegation of section 10(j) authority to the General Counsel has not expired. The Court agrees with Petitioner that the Board's delegation of section 10(j) authority remains intact.

Section 3(b) provides, in relevant part:

> A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, *at all times,* constitute a quorum of the Board, *except that* two members shall constitute a quorum of any group designated pursuant to the first sentence hereof. § 153(b) (emphasis added).

On December 16, 2007, the term of Board Chairman Robert J. Battista expired, leaving four members on the Board. On December 20, 2007, the four-member Board delegated all of its powers to Board Members Liebman, Schaumber, and Kirsanow, and also delegated its section 10(j) authority to the General Counsel. These delegations became effective on December 28, 2007. On December 31, 2007, the appointments of Members Kirsanow and Walsh expired. Accordingly, since January 1, 2008, the Board has been functioning with two members: Liebman and Schaumber.

**26.** The Board revoked this delegation in 1955, but on three other occasions—in 1993, 2001, and 2007–the Board temporarily delegated section 10(j) authority to the General Counsel due to impending Board member vacancies.

First, the Court will address whether Congress spoke precisely to the question at issue: whether a delegation of authority made by a four-member Board expires when the Board membership falls below three members. *See Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. Several circuit courts of appeal have addressed this question in regards to the Board's delegation of its power to a three-member board. The question in those cases was whether the Board must have three sitting members to act by a three-member panel with a two-member quorum. Two circuit courts found that, under the plain meaning of section 3(b), two members of a delegated group of three members constitutes a quorum even if no third member exists. *See New Process Steel, L.P. v. NLRB*, 564 F.3d 840, 845–46 (7th Cir.2009); *Ne. Land Servs., Ltd. v. NLRB*, 560 F.3d 36, 41 (1st Cir.2009). These courts read "except that" as an exception to the requirement that the Board have a quorum of three members at all times. *See New Process Steel, L.P.*, 564 F.3d at 845–46; *Ne. Land Servs., Ltd.*, 560 F.3d at 41. The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), however, found that under the plain meaning of section 3(b), two members cannot constitute a quorum unless the Board quorum—three members—exists. *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 475 (D.C.Cir.2009). In so finding, the D.C. Circuit emphasized that the Board must have a quorum of three members "at all times." *Id.* at 472–73. The D.C. Circuit read the "except that" clause simply as clarifying that two members of a delegated panel of three or more would constitute a quorum. *Id.* at 472.

The United States Court of Appeals for the Second Circuit ("Second Circuit") acknowledged that "this [circuit] split suggests that the statute is ambiguous regarding the enduring or residual powers of an NLRB panel once the Board has lost a quorum." *Snell Island SNF LLC v. NLRB*, 568 F.3d 410, 420 (2d Cir.2009). Accordingly, the Second Circuit turned to canons of construction and legislative history to determine Congress's intent. *Id.* After finding that the canons did not clarify section 3(b), the Second Circuit discovered through legislative history that the purpose of amending the Act in 1947 was to increase the efficiency of the Board by increasing the Board's size. *Id.* at 421 (citing 93 Cong. Rec. 3950, 3953 (Apr. 23, 1947)). Further, prior to the 1947 amendments, the Board commonly issued decisions with only two members, as the Act at that time only required a two-member quorum. *Id.* at 422. Nevertheless, the Second Circuit concluded that legislative history does not speak to whether Congress intended that a delegation by a four-member Board be revoked once Board membership drops below three members. *See id.* at 422–23.

Since the Second Circuit could not discern Congress's intent from the language and legislative history of the statute, the court proceeded to the second *Chevron* step to determine whether the NLRB's interpretation of the statute is permissible. The NLRB interprets the statute as "permitting the two remaining members of the Board to issue labor decisions despite the Board's lack of a quorum." *Id.* at 423. The Second Circuit found the NLRB's interpretation to be reasonable, as it is supported by the language of section 3(b) and the purpose of the 1947 amendments to "increase the Board's overall efficiency," in part by permitting the NLRB to operate in panels of as few as two members. *Id.* Accordingly, the Second Circuit found that the delegation to a three-member panel continued even after the third member ceased to serve on the Board. *Id.* at 424.

The instant issue differs only slightly from the quorum issue addressed above.

Here, Respondent does not challenge an adjudicatory act by a two-member Board. Rather, Respondent challenges the continuing validity of the delegation to the General Counsel of the Board's section 10(j) authority, arguing that if such a delegation was lawful, it expired once the Board lost its three-member quorum. To follow Respondent's logic, the NLRB's delegation to a three-member panel on December 20, 2007, expired on January 1, 2008. Of the four circuit courts to have considered this argument, three have found that the NLRB's delegation to a three-member panel continues to exist.

In deciding the instant issue, the Court first looks to the statute and then, if necessary, to legislative history to discern Congress's intent. The Act does not expressly state that delegated authority expires once the Board lacks a quorum. *See id.* at 423. Rather, pursuant to section 3(b), "[a] vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board . . . ." 29 U.S.C.A. § 153(b). This clause is subject to the quorum requirement: three Board members is a quorum except when the Board has delegated a group of three or more members as a panel for which two members is a quorum. § 153(b); *see Snell Island,* 568 F.3d at 424. Legislative history indicates that Congress 'amended section 3(b) in order to improve Board efficiency. *See Snell Island,* 568 F.3d at 421 & n. 6 (citing 93 Cong. /Rec. 3950, 3953 (Apr. 23, 1947); 93 Cong. Rec. 6593, 6614 (June 5, 1947)); *New Process Steel, L.P.,* 564 F.3d at 847 (noting that the Board was over a year behind in its docket in 1947 and the expansion of the Board and the ability to operate in panels of three would "increas[e] by 10(j) percent [the Board's] ability to dispose of cases expeditiously in the final stage" (quoting S.Rep. No. 80–105, at 8 (1947))). If delegations that the Board made in anticipation of Board vacancies dissolved once the Board reduced

to two members, the Board would come to a standstill. This, no doubt, would defeat the purpose of improving Board efficiency.

Still, legislative history, while helpful, does not show that Congress had a specific intent on this issue. As such, the Court proceeds to the second *Chevron* step to determine whether the NLRB's interpretation of the Act is permissible. The Board explained that it delegated all of its authority to the three-member panel in December 2007 because of the impending Board vacancies that would reduce the Board to two members. Nat'l Labor Relations Bd., Minute of Board Action (Dec. 20, 2007). The Board believed that, in so delegating, the remaining two members would constitute a quorum and enable the Board to continue functioning without a third member. *Id.; see Snell Island SNF LLC,* 568 F.3d at 412. This interpretation was supported by a 2003 Office of Legal Counsel ("OLC") memorandum opinion. *See* U.S. Dep't of Justice, Office of Legal Counsel, Quorum Requirements: Memorandum Opinion for the Solicitor National Labor Relations Board, 2003 WL 24166831, at *1 (Mar. 4, 2003). Relying on statutory construction and aforementioned legislative history, the OLC concluded that the NLRB "may issue decisions even when only two of its five seats are filled, if the Board, at a time when it has at least three members, delegates all its powers to a three-member group" of which the two remaining members are part. *Id.*

The OLC further stated that "a prior delegation of the Board would remain valid, because a vacancy in the position of a delegating authority does not invalidate prior delegations of institutional power by that authority." *Id.* at *3. Indeed, this is an accepted principle of administrative law: " 'The acts of administrative officials continue in effect after the end of their tenures until revoked or altered by their

successors in office. Any other general rule would pose an undue burden on the administrative process.' " [27] *Donovan v. Spadea*, 757 F.2d 74, 77 (3d Cir.1985) (quoting *United States v. Wyder*, 674 F.2d 224, 227 (4th Cir.), *cert. denied sub nom. Mallory v. United States*, 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982)). Construing the Act to permit the delegation of authority to continue even if the Board quorum expires allows the Board to continue its work in a more efficient manner and is a permissible reading of section 3(b). Section 3(d), which allows the Board to delegate its section 10(j) authority to the General Counsel as the Court explained above, does not state that such a delegation must expire when the Board has fewer than three members. Accordingly, the Court finds that the delegation of section 10(j) authority to the General Counsel remains intact.

In summary, the Board's delegation of its section 10(j) authority was lawful and did not expire once Board membership decreased to two members. First, seeking section 10(j) relief is prosecutorial in nature and may be delegated to the General Counsel pursuant to section 3(d). Second, the Board's interpretation of the Act—an interpretation allowing a delegation to remain intact after Board membership falls to two members—is a permissible construction of the statute. Thus, the General Counsel had the authority to file the instant Petition, and the Court has subject matter jurisdiction over it. Accordingly, the Court is of the opinion that the Motion to Dismiss should be denied.

## II. Petition for Temporary Injunction

Having determined that the Court has jurisdiction over the instant Petition, the Court now turns to the merits of the Petition.

### A. Standard

█ As explained above, pursuant to section 10(j) of the Act, a district court can grant the NLRB "such temporary relief ... as it deems just and proper." 29 U.S.C.A. § 160. The Fifth Circuit employs a two-step analysis to determine whether section 10(j) relief is appropriate. First, the Board must show that it "has reasonable cause to believe that unfair labor practices have occurred." *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1189 (5th Cir.1975). Second, the court must determine that "injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.' " *Id.*

In determining "reasonable cause," the court need "only decide that the Board's theories of law and fact are not insubstantial or frivolous." *Id.; Boire v. Int'l Broth., of Teamsters*, 479 F.2d 778, 792 (5th Cir.1973). In so doing, the court must consider the evidence in the light most favorable to the Board. *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 371 (11th Cir.1992); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1084 (3d Cir.1984).

**27.** In *Railroad Yardmasters of America v. Harris*, the D.C. Circuit considered whether a vacancy of the National Mediation Board ("NMB") voided previous delegations by the NMB. 721 F.2d 1332, 1343 (D.C.Cir.1983). In finding that the vacancy had no such effect, the D.C. Circuit noted in dicta that "[i]nstitutional delegations of power ... continue in effect as long as the institution remains in existence and the delegation is not revoked or altered." *Id.; see also Champaign County v.* *U.S. Law Enforcement Assistance Admin.*, 611 F.2d 1200, 1207 (7th Cir.1979) ("[A] delegation of authority survives the resignation of the person who issued the delegation ...."). Similarly, the United States Court of Appeals for the Third Circuit explained that a subpoena does not become unenforceable simply because, before it was served, the Secretary of Labor redelegated the subpoena power to another office. *Donovan v. Spadea*, 757 F.2d 74, 77 (3d Cir.1985).

Accordingly, the Board has a "minimal burden of proof."[28] *Pilot Freight Carriers, Inc.*, 515 F.2d at 1189; *see Gottfried v. Frankel,* 818 F.2d 485, 493 (6th Cir.1987).

■ With regard to whether relief is equitably necessary, a court must be mindful that section 10(j) is an extreme remedy only to be used when the Board considers an employer or union to have "committed such egregious unfair labor practices that any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrated." *Pilot Freight Carriers, Inc.*, 515 F.2d at 1192. Thus, section 10(j) relief should "preserve the Board's processes," not overpower the Board's normal procedures. *Int'l Broth., of Teamsters,* 479 F.2d at 788; *see Pilot Freight Carriers, Inc.*, 515 F.2d at 1192. As such, the Fifth Circuit considers an injunction appropriate when it "maintain[s] the status quo, thereby preserving the legal and factual issues for NLRB disposition."[29] *Pilot Freight Carriers, Inc.*, 515 F.2d at 1193.

Here, Petitioner seeks three forms of relief. First, Petitioner prays the striking employees be reinstated. Second, Petitioner requests that Respondent be ordered to recognize and bargain with the Union. Finally, Petitioner asks that Respondent rescind unilaterally-changed work rules. For these three distinct requests, the Court must assess whether Petitioner has sustained its reasonable cause burden and whether the relief is equitably necessary. The Court engages in this analysis below.

### B. Reinstatement of Striking Workers

First, Petitioner argues that fifty-five workers engaged in an unfair labor practice strike and that Respondent violated section 8(a)(1) and (3) when it did not reinstate the striking workers upon their unconditional offer of employment. As unfair labor practices precipitating the strike,

28. Although a court must conduct an independent review of the record to find reasonable cause, "the ALJ's factual and legal determinations supply a useful benchmark against which the [petitioner's] prospects of success may be weighed." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir.2001); *see Rivera–Vega v. ConAgra, Inc.*, 70 F.3d 153, 161 (1st Cir.1995) (concluding reasonable cause existed based on the court's independent review and then finding support for that decision in the ALJ's determination that respondents violated the Act); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37 n. 7 (2d Cir.1975) (finding the district court's conclusion was bolstered by the ALJ's subsequent findings that unfair labor practices had been committed).

29. Other circuits explicitly apply the traditional equitable criteria to section 10(j) proceedings. *See, e.g., Pye v. Sullivan Brothers Printers, Inc.*, 38 F.3d 58, 63 (1st Cir.1994); *Miller v. Ca. Pac. Med. Ctr.*, 19 F.3d 449, 459 (9th Cir.1994); *Kinney v. Pioneer Press*, 881 F.2d 485, 490–491 (7th Cir.1989); *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir. 1980). Traditional equitable criteria are: (1) substantial likelihood of petitioner's success on the merits, (2) substantial threat that petitioner will suffer irreparable injury if the injunction is not granted, (3) whether the threatened injury to petitioner outweighs the harm the injunction may do to respondent, and (4) whether the injunction disserves the public interest. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). The Fifth Circuit has not expressly held that the "just and proper" prong entails an inquiry into the four traditional equitable criteria. Instead, the Fifth Circuit recognizes that a judge "does not abdicate his [equitable] powers merely upon a showing that the Regional Director's theories surpass frivolity." *Boire v. Pilot Freight Carriers, Inc.* 515 F.2d 1185, 1193 (5th Cir.1975). As such, the Court does not explicitly apply the traditional criteria and instead considers whether the requested relief is an equitable necessity because it will preserve the status quo and the Board's processes. *Id.* at 1192; *but see Fleishut v. Avondale Indus., Inc.*, N. 94–3500, 1995 WL 27464, at *3 (E.D.La. Jan. 23, 1995) (applying traditional equitable criteria in section 10(j) case).

Petitioner cites Respondent's delay in beginning bargaining and intermittent negotiation meetings, failure to vest bargaining authority in one agent instead of three, failure to bargain over a Dues Check–Off provision, a premature last, best, and final offer, and conduct away from the bargaining table. Petitioner argues that the strike was based in part on delayed bargaining, as Aguirre referred to the strike as an unfair labor practice strike during the strike meeting on November 13, 2007. Respondent counters that the strike was economic in nature and not over unfair labor practices, and the Board will not order the reinstatement of the strikers. Further, Respondent argues that reinstatement is not an appropriate section 10(j) remedy, as such matters are usually left to the Board and will not now—over eighteen months after the strike began— help to preserve the status quo *ante*, as the harm has already been incurred. Petitioner replies that the months or years before the Board issues its decision in this matter are crucial as this time provides the Union an opportunity to regain the support it enjoined prior to the alleged unfair labor practices. Thus, Petitioner believes reinstating the strikers will help build Union support and preserve the status quo *ante* without harming Respondent, since Respondent will be receiving trained and experienced workers. The Court agrees with Petitioner.

### 1. Reasonable Cause

Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act]." 29 U.S.C.A. § 158(a)(1) (West 1998). Those rights include "the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing ...." 29 U.S.C.A. § 157 (West 1998). Similarly, under section 8(a)(3), it is an unfair labor

practice for an employer to encourage or discourage membership in a labor organization by discriminately hiring or terminating employees or changing terms of employment. § 158(a)(3). Additionally, section 8(d) confers on both employer and labor organization a duty to bargain collectively by "meet[ing] at reasonable times and confer[ing] in good faith with respect to wages, hours, and other terms and conditions of employment ...." § 158(d). Accordingly, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." § 158(a)(5). While the Board cannot force an employer to make a specific concession, the employer is obliged to make some reasonable effort to resolve its differences with the union. *Regency Serv. Carts, Inc. & Shopmen's Local,* 345 N.L.R.B. 671, 671 (2005). " '[M]ere pretense at negotiations with a completely closed mind and without a spirit of cooperation does not satisfy the requirements of the Act.' " *Id.* (quoting *Mid–Continent Concrete,* 336 N.L.R.B. 258, 259 (2001)). To determine whether a party has engaged in surface bargaining only, the Board will consider the totality of a party's conduct, including factors such as "delaying tactics, the nature of bargaining demands, unilateral changes in mandatory subjects of bargaining, efforts to bypass the union, [and] failure to designate an agent with sufficient bargaining authority...." *Id.*

In order to be labeled as an unfair labor practice strike as opposed to an economic strike, an unfair labor practice must be a "contributing cause" of the strike. *Pirelli Cable Corp. v. NLRB,* 141 F.3d 503, 517 (4th Cir.1998) (noting that a "causal link between the unfair labor practice and the strike" must exist); *C–Line Express,* 292 N.L.R.B. 638, 639 (1989). This causal connection depends on the strikers' state of mind. *In re Post Ten-*

*sion of Nev., Inc.,* 352 N.L.R.B. 1153, 1163 (2008). Assurances by union leaders alone that members will enjoy the protections of engaging in an unfair labor practice strike are insufficient. *Pirelli Cable Corp.,* 141 F.3d at 518–19; *Ca. Acrylic Indus., Inc. v. NLRB,* 150 F.3d 1095 (9th Cir.1998). Nevertheless, the Board can consider the stated purpose of the strike and language on strikers' signs in determining whether a strike is an unfair labor practice strike. *See Page Litho, Inc.,* 311 N.L.R.B. 881, 891 (1993); *R & H Coal Co.,* 309 N.L.R.B. 28, 28 (1992). This distinction is significant because, unlike an economic striker, an unfair labor practice striker is entitled to immediate reinstatement to his former position or to back pay upon an unconditional offer to work. *In re Nortech Waste & Operating Eng'rs Local,* 336 N.L.R.B. 554, 565 (2001) (citing *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956)). Reinstatement is required even if the unfair labor practice striker has already been replaced. *Id.; see Maram v. Universidad Interamericana de Puerto Rico, Inc.,* 722 F.2d 953, 959 (1st Cir.1983) (noting that the replacement workers should have understood their positions to be tenuous when they accepted the employment).

▇ Here, Petitioner has presented reasonable cause that Respondent violated section 8(a)(1) and (3) by refusing to reinstate unfair labor practice strikers. First, the Court considers whether reasonable cause exists that Respondent engaged in unfair labor practices. Respondent had a duty to meet at reasonable times and engage in good faith bargaining. *See* 29 U.S.C.A. § 158(d). Petitioner offered the following as evidence that Respondent violated this duty: the first bargaining meeting occurred nearly four months after recognition of the Union despite attempts to have an earlier meeting, Union representatives' repeated requests for more frequent negotiation sessions were rebuffed by Respondent's authorized representatives, Respondent refused to negotiate the Dues Check–Off provision,[30] and Respondent offered a last, best, and final offer after only two meetings negotiating wages and never having negotiated longevity bonuses. Additionally, Respondent's actions away from the bargaining table contributed to Union members' belief that the negotiating was in bad faith: Respondent engaged in unilateral changes, unlawfully sought employees' grievances about the Union and promised to remedy them, and failed to respond to the Union's information requests.[31]

---

**30.** The Fifth Circuit has recognized that a Dues Check–Off provision is a mandatory subject of bargaining under section 8(a)(5) and (d). *Sweeney & Co., Inc. v. NLRB,* 437 F.2d 1127, 1134–35 (5th Cir.1971) (upholding Board's decision that employer bargained in bad faith because would not negotiate on Dues Check–Off provision).

**31.** Such conduct away from the bargaining table evidences bad faith. *In re Hardesty Co., Inc.* 336 N.L.R.B. 258, 258 (2001). Reasonable cause for unilateral changes occurring pre-strike exists based on the following: Respondent issued a sick leave policy requiring a doctor's note in certain circumstances where it had not been required previously, Respondent changed Vasquez's and Gonzalez's positions and granted Gonzalez a wage

increase, and Respondent failed to give Jose Duran a watch as per Respondent's longevity policy. Respondent did not give the Union notice of or an opportunity to bargain over any of these changes. Reasonable cause for Respondent's unlawful dealings with employees exists based on Dupreau's meetings with employees during which he elicited employees' complaints about the Union and promised either explicitly or implicitly to remedy them, a charge with which ALJ Litvack agreed. Further, "an employer must provide an incumbent union with requested information, which is necessary and relevant to the performance of its role as collective-bargaining representative." *Id.* It is undisputed that Respondent did not provide the Union with requested names of current employees and the replacement workers. At least the names

Thus, Petitioner has shown reasonable cause that Respondent engaged in unfair labor practices.

Next, the Court considers whether these alleged unfair labor practices causally contributed to the strike. While employees testified to economic reasons for the strike, several employees credibly testified that Respondent's delay in bargaining was a motivating factor for their decision to strike. Further, Aguirre told employees that he believed the strike would be an unfair labor practice strike, and strikers carried placards indicating that they were conducting an unfair labor practice strike. Thus, construing the evidence in a light most favorable to Petitioner, there is reasonable cause to believe that unfair labor practices causally contributed to the strike. Indeed, the Board's theories of law and fact on this matter are not insubstantial or frivolous. Consequently, Petitioner satisfied its minimal burden. Further, as there is reasonable cause to believe that the strikers engaged in an unfair labor practice strike, there is reasonable cause to believe that Respondent violated section 8(a)(1) and (3) by not reinstating the striking workers upon their unconditional offer of reinstatement on December 4, 2007.

### 2. Equitable Necessity

The Court must now determine whether reinstatement of the fifty-five striking workers is "just and proper." *See* 29 U.S.C.A. § 160(j). The Fifth Circuit recognizes that the "reinstatement of unlawfully discharged employees . . . [is] generally left to the administrative expertise of the Board." *Pilot Freight Carriers, Inc.,* 515 F.2d at 1192. Still, a court must look at the detrimental effect of the discharges on Union support and determine whether temporarily reinstating the discharged workers pending resolution by the Board

will help to preserve the status quo *ante*. *See id.* at 1193. In *Pilot Freight Carriers, Inc.,* the Fifth Circuit held that the district court did not "abuse its discretion in failing to order reinstatement of the two employees arguably discharged for union activity." *Id.* The Fifth Circuit determined that "the detrimental effects of the discharges [had] already taken their toll on the organizational drive" in part because the Board petitioned for temporary relief three months after the employees were terminated. *Id.* Although the passage of time between the discharge and the petition is not determinate, the Fifth Circuit considered it to be "some evidence" that the harm had already been incurred. *Id.* The Fifth Circuit concluded that, since it was questionable whether reinstatement at that time would be more effective than a final Board order, the issues were preserved for the Board's review without reinstatement. *Id.*

Similarly, in *Overstreet v. El Paso Electric Company,* the Fifth Circuit held that the district court did not abuse its discretion by not reinstating a discharged employee. 176 Fed.Appx. 607, 611 (5th Cir. 2006). The district court had refused to reinstate the employee because it was not clear that the discharge resulted in fear of further reprisals and because the Board filed the petition seven months after the employee's discharge. *Id.* at 609. Accordingly, the court determined that reinstatement "would not now alter the ability of the Union to operate." *Id.* While the Fifth Circuit affirmed the lower court, it noted that the court ordered the employer into collective bargaining with the union but "did not foster the best possible environment in which such negotiations might prosper" by not reinstating the employee.

of current employees were necessary and relevant to the Union's role as collective-bargaining representative. Therefore, Petitioner presented reasonable cause to believe that Respondent violated section 8(a)(5).

*Id.* at 611 n. 18 (refusing to substitute its judgment for that of the district court). In short, simply because neither of these cases presented a situation where reinstatement would alter the ability of a union to operate and preserve the Board's ability to accord effective relief by preserving the status quo *ante*, does not mean that the Fifth Circuit would never affirm temporary reinstatement as section 10(j) relief.

Indeed, other courts have accorded such relief. For example, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") affirmed the temporary reinstatement of four discharged employees who had been "the nucleus of the organizational campaign." *Angle v. Sacks*, 382 F.2d 655, 661 (10th Cir.1967). The Tenth Circuit believed that reinstatement would, as much as possible, restore the status quo *ante* and therefore prevent frustration of the Board's ultimate action. *Id.* Similarly, a court ordered reinstatement where it believed that the employer was chilling organizational efforts by discharging select union supporters, thereby significantly frustrating the organizational drive while awaiting an order from the Board. *Davis v. R.G. LeTourneau, Inc.*, 340 F.Supp. 882, 884 (E.D.Tex.1971). In another case, the United States Court of Appeals for the Seventh Circuit ordered reinstatement of ten workers, emphasizing the detrimental effect of the passage of time on organizational efforts, given that

the Board may not reach the merits of a case for years. *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir.1996). "As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *Id.* Accordingly, if a discharge has a minimal effect on bargaining and organizational efforts, then reinstatement may not be necessary to preserve the status quo *ante*.[32] Where, instead, employees that comprise the nucleus of organizational or bargaining efforts are discharged, then the chilling effect is substantial and may warrant temporary reinstatement.[33]

Further, the passage of time between discharge of an employee and the filing of a section 10(j) petition should not control reinstatement. While circuit courts have noted such delays, the United States Court of Appeals for the Third Circuit ("Third Circuit") cautioned that the Board must be afforded a "certain leniency ..., stemming from the deference to the Board that is built into the statutory scheme." *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir.1990). The Third Circuit explained that "[t]he Board needs time to do a thorough investigation before it even requests the injunction. To require the Board to sacrifice thorough evaluation for speed would dissipate the Board's expertise, and

---

**32.** *See, e.g., Overstreet v. El Paso Elec. Co.,* 176 Fed.Appx. 607, 611 (5th Cir.2006); *Pilot Freight Carriers, Inc.,* 515 F.2d at 1193; *Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1091–92 (3d Cir.1984) (finding that where retaliation is against an established bargaining unit—thirty-eight employees represented by the same union for fourteen years, unlawful employment practices have little chilling effect because workers are aware of their rights under the Act).

**33.** *See, e.g., NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1573 (7th Cir.1996); *Pascarell v.*

*Vibra Screw, Inc.,* 904 F.2d 874, 880–81 (3d Cir.1990) (reversing order denying reinstatement because the "union had recently been certified, management had demonstrated anti-union bias, and, most importantly, management had fired the few employees who had been the most open in their support for the union"); *Maram v. Universidad Interamericana de Puerto Rico, Inc.,* 722 F.2d 953, 959 (1st Cir.1983) (reinstating entire workforce that was discharged in the face of unionization); *Angle,* 382 F.2d at 661; *Davis v. R.G. LeTourneau, Inc.,* 340 F.Supp. 882, 884 (E.D.Tex.1971).

dilute the statutory deference principle." *Id.* (finding a delay of six months not unreasonable, particularly "given the ongoing, cumulative nature of the allegedly unfair labor practices in this particular case"). Accordingly, courts must consider the delay given the circumstances of a specific case, keeping in mind that the relevant inquiry is whether the Board's remedy would be ineffective without section 10(j) relief.[34] As such, courts have reinstated workers where more than a year passed between discharge and filing a section 10(j) petition. *See, e.g., Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539, 544–45 (4th Cir.2009) (affirming injunctive relief ordering respondent to offer employment to allegedly discriminated employees despite eighteen-month delay, recognizing that "[c]omplicated labor disputes like this one require time to investigate and litigate"); *Hirsch v. Dorsey Trailers*, 147 F.3d 243, 248–49 (3d Cir.1998) (issuing injunction despite fourteen-month delay). These decisions reflect the courts' recognition that "[i]t is inappropriate to punish employees for the Regional Director's delay." *Blyer v. Pratt Towers, Inc.*, 124 F.Supp.2d 136, 147 (E.D.N.Y.2000).

Here, Respondent permanently replaced fifty-five employees on November 21, 2007, when they commenced what the Board has reasonable cause to believe was an unfair labor practice strike. On December 4, 2007, the employees made an unconditional offer of return, which Respondent denied. Since that date, Respondent has made recall offers to thirteen drivers; nine accepted these offers, and five resigned. Respondent has successfully recalled four maintenance employees, and Juan Castillo resigned while two others retired. Ap-

proximately sixteen strikers from each Unit remain on the recall list and in the El Paso, Texas, area. In total, at the time of the strike, the striking employees represented approximately 79 percent of the Maintenance Unit (twenty-seven maintenance employees) and 43 percent of the Drivers Unit (twenty-eight drivers).

Furthermore, Petitioner has reasonable cause to believe that the discharge chilled Union support. Twenty-eight maintenance employees (88 percent of the Maintenance Unit) and thirty-two drivers (56 percent of the Drivers Unit) voted to unionize in 2006. Following the discharge, fifty drivers, including replacement workers, signed the December 2007 disavowal petition. In effect, Respondent refused to reinstate a large nucleus of the Union's support. Not only did this physically remove Union supporters from the workplace, it no doubt chilled the Union's support of employees who were still employed by Respondent. By November 2008, nearly a year after the discharge, a majority of the Drivers and Maintenance Units—including six reinstated strikers—signed petitions disavowing interest in the Union. Nevertheless, the Union currently enjoys some support, as evidenced by the 15 percent of the Drivers Unit and 13 percent of the Maintenance Unit that did not disavow the Union in November 2008. It is reasonable to believe that this limited support will increase if the discharged workers are reinstated. In contrast, if Petitioner waits months or years for a ruling from the Board, this spark of support will likely die, rendering the Board's remedy ineffective.

The Court acknowledges that nearly eighteen months passed between the dis-

---

**34.** *See Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 879 (3d Cir.1990); *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000); *Pilot Freight Carriers, Inc.*, 515 F.2d at 1192; *Blyer v. Pratt Towers, Inc.*, 124 F.Supp.2d 136, 147 (E.D.N.Y.2000) ("Delay, however, should not be taken into consideration unless ... circumstances have changed that affect the appropriateness of such relief.").

charge and the filing of the instant Petition. Nevertheless, the Court believes the delay to have been reasonable. This is a complex case necessitating extensive investigation by the Board. Further, given the complexity of this case and alleged ongoing violations, it was reasonable for the Board to await a ruling by the ALJ before filing a section 10(j) petition.[35] *See Muffley,* 570 F.3d at 544. More importantly, the Court believes that the delay has not completely eviscerated the possibility that the Board's relief will be effective, provided that the requested temporary injunction is granted. While a substantial delay such is at issue here runs the risk of nullifying section 10(j) relief, the Court believes that reinstatement at this time will help return the situation to the status quo *ante* and that otherwise the Board's process would be rendered impotent.

Respondent claims that reinstatement will cause Respondent irreparable harm. This claim is not supported by the record. Respondent will be receiving employees with an average of ten years work experience. While a minimum amount of training may be necessary, this in no way rises to irreparable harm. Respondent further claims that the strike replacements will be irreparably harmed by this relief. To be sure, the strike replacements will be harmed by losing their current employment, but this is not the focus of the Court's inquiry. Further, the strike replacements signed agreements expressly acknowledging that they were replacing striking workers and, therefore, could be replaced when the strike ended. Thus, the strike replacements knew that their accepted positions were tenuous. According-

ly, the Court is not swayed by Respondent's protested harm.[36]

Finally, the Court must consider in this "just and proper" prong whether "relief would serve the purposes of the Act ...." *Pilot Freight Carriers, Inc.,* 515 F.2d at 1193. One purpose of the Act is to encourage collective bargaining and protect workers' rights to associate, self-organize, and designate representatives of their own choosing to negotiate the terms and conditions of their employment. 29 U.S.C.A. § 151 (West 1998). In the instant case, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiations, and thereby encourage collective bargaining and protect workers' associational rights, will be impaired. Indeed, it is amazing that—after Respondent discharged a large nucleus of support for the Union—any support for the Union exists at all. The Court is convinced that, absent temporary relief, the meager support the Union currently enjoys will dissipate before the Board reaches the merits of this case. At that point, the purpose of the Act would have been frustrated and the Board would not be able to enter an effective remedy. Therefore, the Court is of the opinion that the fifty-five strikers should be temporarily reinstated.

### C. Interim Recognition and Bargaining

■ Next, Petitioner prays the Court order Respondent to temporarily recognize the Union and engage in bargaining. Petitioner argues that the anti-Union petitions were tainted by unremedied unfair labor practices and thus cannot be relied

---

**35.** Indeed, the last unfair labor practice complaint was filed on March 23, 2009, approximately four months before Petitioner filed the instant Petition.

**36.** Respondent's argument that an injunction should not issue because the Board has not

made a finding that the strikers were unfair labor practice strikers contradicts Congress's intent for section 10(j) in providing temporary relief pending the Board's resolution of a matter.

upon by Respondent. Further, Petitioner contends that an interim bargaining order is just and proper based on the unilateral changes in working conditions. Respondent asserts that it properly withdrew recognition of the Union after receiving disavowal petitions from a majority of employees in both Units that were not causally related to any actions that the Board has determined to be unfair labor practices. Further, Respondent argues that Petitioner has not shown that an interim order is equitably necessary, as more than a year has passed since the Union's certification, the Union refused to bargain during 2008, and Petitioner delayed six months in filing the instant Petition from the withdrawal of recognition. Petitioner replies that ALJ Litvack properly found that Respondent's unfair labor practices caused employee disaffection with the Union. Petitioner urges that an interim bargaining order is necessary to protect the efficacy of the Board's final remedy and the employees' collective-bargaining rights. The Court agrees with Petitioner.

### 1. Reasonable Cause

■ Section 8(a)(5) provides that it is an "unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees." 29 U.S.C.A. § 158(a)(5). Once a union has been certified, and thereby established a bargaining obligation, an employer cannot withdraw recognition within the year following certification. *United Supermarkets, Inc. v. NLRB*, 862 F.2d 549, 552 (5th Cir.1989); *Chelsea Indus., Inc. & Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of Am.*, 331 N.L.R.B. 1648, at *3 (2000). After the "certification year," an employer can rebut the presumption of union support and uni-

laterally withdraw recognition from an incumbent union upon a showing that the union has lost the support of a majority of the bargaining unit employees. *Levitz Furniture Co. of the Pac., Inc.*, 333 N.L.R.B. 717, 717 (2001).

■ If an employer presents evidence that, at the time it withdrew recognition, the union had lost majority support, the burden then shifts to the General Counsel to rebut the employer's evidence.[37] *Id.* at 725 n. 49. Even in the face of an actual loss of majority support, the Board will invalidate a withdrawal of recognition if (1) the record establishes that the employer's prior unfair labor practices causally contributed to dissatisfaction with the union and its subsequent loss of majority support, *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984), or (2) the record establishes that the petition was tainted by excessive employer involvement, *Bridgestone/Firestone, Inc.*, 335 N.L.R.B. 941, 948 (2001). A good faith belief that a union lost majority support is not a defense. *Levitz Furniture Co. of the Pac., Inc.*, 333 N.L.R.B. at 725.

Here, the Union's certification year expired in September and October 2007. Thereafter, Respondent could lawfully withdraw its recognition upon a showing that the Union lost the support of a majority of the bargaining unit employees. Respondent withdrew recognition in January 2009 after receiving proof of an actual loss of majority support, the November 2008 disavowal petitions. Nevertheless, the Board can invalidate Respondent's withdrawal of recognition if Respondent's prior unfair labor practices causally contributed to the Union's loss of majority support or if Respondent tainted the November 2008 disavowal petitions by excessive involvement. Petitioner does not allege and the

---

**37.** Even if the General Counsel does not present rebuttal evidence, the employer must establish loss of majority support by a prepon-

derance of all the evidence. *Levitz Furniture Co. of the Pac., Inc.*, 333 N.L.R.B. 717, 725 n. 49 (2001).

record does not support that Respondent tainted the November 2008 disavowal petitions by excessive involvement. Petitioner alleges, however, that there is reasonable cause to believe that Respondent committed unfair labor practices which causally contributed to the Union's loss of majority support. If so, then Respondent wrongfully withdrew recognition of the Union.[38]

As discussed at length in Section II.B, the Court finds reasonable cause to believe that Respondent violated the Act by engaging in bad faith bargaining, making unilateral work policy changes, intimidating workers, retaliating against strikers, and permanently replacing fifty-five unfair labor practice strikers.[39] Such egregious violations of the Act would no doubt dampen support for the Union, as Respondent's violations prevented the Union from realizing benefits for the employees. Further, by permanently replacing the strikers, Respondent in effect removed the Union's most vocal supporters. Unsurprisingly, shortly after Respondent refused to reinstate the strikers, a majority of drivers signed the December 2007 disavowal petition. Thus, there is reasonable cause to believe that the December 2007 disavowal petition was causally related to Respondent's unfair labor practices.

The Court also has reasonable cause to believe that Respondent continued to violate the Act in 2008. First, Respondent recalled drivers out of the order listed in the preferential hire list, denied unfair labor practice strikers access to employee entrances and parking lots, denied strikers their longevity bonuses, and terminated strikers' recall rights when the strikers declined substantially different positions for less pay. Second, a majority of the Drivers Unit employees who signed the December 2007 disavowal petition also signed the November 2008 disavowal petition.[40] The Maintenance Unit is comprised mostly of strike replacements who unsurprisingly signed the November 2008 disavowal petitions. With such a large majority of signatures on the November 2008 disavowal petitions belonging to employees who either signed the December 2007 disavowal petition or are replacement workers, Petitioner has shown reasonable cause that the November 2008 disavowal petitions, upon which the withdrawal of recognition is based, were causally connected to Respondent's unfair labor practices. Accordingly, Petitioner has demonstrated substantial, non-frivolous legal and factual theories showing that the Board will invalidate Respondent's withdrawal of recognition of the Union and order Respondent to bargain.

### 2. Equitable Necessity

Next, the Court considers whether an interim bargaining order is just and prop-

---

**38.** ALJ Kocol heard testimony at the end of August 2009 regarding this matter. During the hearing, counsel for Respondent properly conceded that if the Board finds that the strike was indeed an unfair labor practice strike then the withdrawal of recognition, refusal to bargain, and other allegations also constituted violations of section 8(a)(5). As the Court already found that Petitioner presented reasonable cause to believe that the strike was an unfair labor practice strike, it follows that Petitioner presented reasonable cause to believe that the withdrawal of recognition, refusal to bargain, and unilateral changes were unlawful.

**39.** Respondent's only asserted defense is that the Board has not held that Respondent committed unfair labor practices. Respondent's argument is a poor attempt to mask the fact that this temporary relief is sought *because* the Board has not yet ruled on the alleged violations.

**40.** The drivers who signed the December 2007 disavowal petition comprise thirty-five of the fifty signatures on the November 2008 disavowal petition, with six of the remaining signatures belonging to replacement workers.

er. An interim bargaining order compels parties to bargain in good faith, but it cannot compel either party to agree to any specific proposal. *See Overstreet v. Thomas Davis Med. Ctrs., P.C.*, 9 F.Supp.2d 1162, 1167 (D.Ariz.1997); *Gottfried v. Mayco Plastics, Inc.*, 472 F.Supp. 1161, 1167 (E.D.Mich.1979), *aff'd* 615 F.2d 1360 (6th Cir.1980). The interim order lasts only until the Board enters a final decision. Further, any agreement reached by the parties can contain a condition subsequent, recognizing that the Board may refuse to grant a final bargaining order remedy. *See Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 28 (1st Cir.1986); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975).

In the Fifth Circuit, courts issue interim bargaining orders where a "pre-established bargaining relationship is being eroded by unfair labor practices." *Pilot Freight Carriers, Inc.*, 515 F.2d at 1194 (citing *Davis v. Servis Equip. Co.*, 341 F.Supp. 1298 (N.D.Tex.1972) and *Lebus v. Manning, Maxwell & Moore, Inc.*, 218 F.Supp. 702 (W.D.La.1963)).[41] The Fifth Circuit is hesitant to enter an interim bargaining order when doing so rests on the assumption that an employer actually committed unfair labor practices. *Id.* Nevertheless, the Fifth Circuit looks to harm caused by not bargaining to determine whether interim relief is justified. *Id.* In *Pilot Freight Carriers, Inc.*, the Fifth Circuit was "not convinced that a continuation of the non-bargaining status will so deleteriously affect the union that it cannot recover," and thus the court refrained from granting an interim bargaining order. *Id.* There, however, an interim bargaining order would have altered the status quo

*ante*, since the union was not a certified representative prior to the alleged unfair labor practices. *Id.*

Here, the status quo *ante* is post-certification and pre-strike. The alleged unfair labor practices began during negotiations, culminating in the first complaint filed on November 14, 2007, regarding unilateral changes to the longevity bonus policy, threats of replacing employees who strike, direct dealings with employees, and bad faith negotiation practices. Accordingly, returning to the lawful status quo would entail returning to a point when Respondent recognized and bargained with the Union. Further, Respondent does not argue it would suffer irreparable harm, and the Court does not believe that irreparable harm will result, as each Party pays its own costs of bargaining and is merely ordered to bargain in good faith. Respondent complains, however, that a bargaining order would be unjust since the Union refused to bargain in 2008 and delayed several months in filing the Petition after Respondent withdrew its recognition. The Court notes that the Union's refusal to bargain was reasonable, given that Respondent permanently replaced what Petitioner reasonably believes are unfair labor practice strikers. Additionally, as explained in Section II.B, the filing delay in a complex case such as this is not unreasonable. Finally, ordering temporary recognition and bargaining will further the Act's purpose of encouraging collective bargaining and protecting workers' associational rights. *See Pilot Freight Carriers, Inc.*, 515 F.2d at 1193. Therefore, the Court is of the opinion that the requested tempo-

---

41. *See, e.g., Overstreet v. El Paso Elec. Co.*, 176 Fed.Appx. 607, 611 n. 18 (5th Cir.2006) (ordering interim collective bargaining); *Davis v. Servis Equip. Co.*, 341 F.Supp. 1298, 1302 (N.D.Tex.1972) (same). Courts in other circuits regularly order interim bargaining orders as section 10(j) relief where doing so is the only way to preserve the Board's ability to give effective relief. *See, e.g., NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1574–75 (7th Cir.1996).

rary relief of interim recognition and bargaining should be granted.

### D. Rescission of Unilateral Changes

■ Lastly, Petitioner requests that the Court rescind Respondent's unilateral changes, namely the changes to Respondent's longevity bonus and sick leave policies as well as wage increases and the withdrawal of recognition. Petitioner argues that these changes violated either section 8(a)(3) or (5). Further, Petitioner contends that the rescission of the new work rules is just and proper to restore the lawful status quo and remove the chill upon the employees. Respondent does not respond specifically to Petitioner's request or argue that rescission of these changes is not just and proper. Upon review of the record, the Court is of the opinion that Petitioner has shown reasonable cause to believe that Respondent made these unilateral changes. For example, Respondent does not contest that it did not provide strikers with longevity bonuses, that it increased incentive-pay drivers' wages, or that it withdrew recognition of the Union. Rather, Respondent argues these actions were not unlawful because the strike was economic in nature. As explained above, Petitioner has shown reasonable cause to believe that the strike was an unfair labor practice strike. Therefore, the Court has reasonable cause to believe Respondent violated section 8(a)(3) or (5) by committing these un-negotiated changes.

Since Respondent has not advanced any argument that rescission would cause Respondent irreparable harm, the Court looks only to whether rescission is just and proper to return to the lawful status quo. Prior to the alleged unlawful labor practices, Respondent recognized and was engaged in collective bargaining with the Union. Respondent was, thus, unable to make any unilateral changes relating to terms and conditions of employment be-

cause those were mandatory subjects for collective bargaining. Further, the Court has already determined that interim recognition and a bargaining order are appropriate section 10(j) relief in the instant matter. To best promote conditions for collective bargaining, effectuate the purposes of the Act, and return to the status quo *ante*, the Court is of the opinion that rescission of unilateral changes is also necessary.

In summary, the Court is of the opinion that Petitioner has shown reasonable cause that Respondent violated the Act and that Petitioner's requested interim relief is just and proper. First, reasonable cause exists that Union members engaged in an unfair labor practice strike based on Respondent's bad faith and dilatory negotiating practices. Respondent thereafter permanently replaced the unfair labor practice strikers in violation of the Act. Despite the eighteen months that passed between the strike and the filing of the instant Petition, reinstatement of the strikers is equitably necessary because Respondent permanently replaced a large nucleus of Union supporters, yet some Union support still exists. Accordingly, the Court believes that reinstatement at this moment could allow the Parties to reestablish the status quo *ante*. Second, reasonable cause exists that the November 2008 disavowal petitions were tainted by Respondent's unfair labor practices and that, therefore, Respondent's withdrawal of recognition was unlawful. Further, it is just and proper for Respondent to be ordered to recognize the Union and bargain with it. Finally, the Court has reasonable cause to believe that Respondent made unilateral changes, and it is just and proper that these changes be rescinded upon request by the Union. This temporary relief will help restore the lawful status quo, thereby empowering the Board to impose effectual remedies. Ac-

cordingly, the Court is of the opinion that the instant Petition should be granted.

## CONCLUSION

For the reasons stated above, the Court has jurisdiction over the instant Petition. The Board's delegation of its section 10(j) authority to the General Counsel is lawful and did not expire when the Board membership fell below three active members. Further, the Court is of the opinion that the requested section 10(j) relief is appropriate in this case, as Petitioner presented reasonable cause to believe that Respondent violated the Act and also showed the requested relief to be just and proper. In the interest of preserving the Board's ability to craft an effective remedy by returning the situation between Respondent and the Union to the lawful status quo, the Court will enter a temporary injunction order pursuant to section 10(j). Therefore, Respondent must temporarily reinstate the striking workers, recognize and bargain with the Union, and rescind unilateral work policy changes upon the Union's request.

Accordingly, **IT IS HEREBY ORDERED** that Respondent El Paso Disposal, L.P.'s "Motion to Dismiss for Lack of Subject Matter Jurisdiction" is **DENIED.**

**IT IS FURTHER ORDERED** that Petitioner Cornele A. Overstreet's "Petition for Temporary Injunction Pursuant to Section 10(j) of the National Labor Relations Act, as Amended [29 U.S.C. Section 160(j) ]" is **GRANTED.**

### *ORDER GRANTING TEMPORARY INJUNCTION PURSUANT TO 29 U.S.C. § 160(j)*

On this day, the Court considered Petitioner Cornele A. Overstreet's "Petition for Temporary Injunction Pursuant to Section 10(j) of the National Labor Relations Act, as Amended [29 U.S.C. Section 160(j) ]," filed in the above-captioned cause on July 27, 2009. Upon consideration of the pleadings, evidence, briefs, arguments of counsel, and the entire record in the instant case, the Court entered a Memorandum Opinion and Order, finding and concluding that there is reasonable cause to believe that Respondent El Paso Disposal, L.P. has engaged in and is engaging in conduct in violation of section 8(a)(1), (3), and (5) of the National Labor Relations Act ("Act"). The Court believes that such acts and conduct will likely be repeated or continued unless enjoined and that the requested temporary injunctive relief pursuant to section 10(j) of the Act is just and proper in this case. Accordingly, the Court is of the opinion that the following order should enter:

**IT IS HEREBY ORDERED** that, pending the final disposition of the proceeding now pending before the National Labor Relations Board ("the Board"), Respondent and its. officers, agents, servants, representatives, employees, successors and assigns, and all persons and members acting in concert with it shall be, and they hereby are:

1. **Enjoined and restrained from:**

(a) Failing or refusing to recognize and, upon request, bargain in good faith with the International Union of Perating Engineers, Local 351, AFL–CIO ("the Union") as the exclusive collective-bargaining representative of the following two units of employees regarding their wages, hours, and other terms or conditions of employment:

(i) All compactor maintenance employees, container maintenance employees, and fleet maintenance employees employed by Respondent in El Paso, Texas; excluding all drivers, dispatchers, sales employees, office clerical employees, janitors, guards and supervisors as defined in the Act ("Maintenance Unit"); and

(ii) All front load drivers, residential drivers, relief drivers, roll off drivers, bug-

gy drivers, storage unit drivers, Poly Cart drivers, and bulk drivers employed by Respondent in El Paso, Texas; excluding all other employees, including compactor maintenance employees, container maintenance employees, fleet maintenance employees, dispatchers sales employees, office clerical employees, janitors, guards and supervisors as defined in the Act ("Drivers Unit").

(b) Engaging in bad-faith bargaining, including engaging in dilatory tactics regarding the scheduling of bargaining sessions, failing and refusing to meet regularly with the Union and at reasonable intervals, unreasonably limiting the duration of negotiating sessions, failing to designate an agent with sufficient bargaining authority, refusing to accede to a Dues Check–Off provision, and presenting premature final offers to the Union;

(c) Unilaterally giving employees a wage increase, changing its sick leave rules or longevity bonus practice, or changing employees' job assignments, methods of pay, or wage rates without first notifying the Union and affording it a reasonable opportunity to bargain about such changes;

(d) Failing and refusing to provide relevant information requested by the Union for the purpose of carrying out its representational duties, including the names and addresses of employees in its Maintenance and Drivers Units;

(e) Discriminating against unfair labor practice strikers by failing and refusing to immediately reinstate them to their former positions upon the Union's unconditional offer to return to work;

(f) Condition the reinstatement of unfair labor practice strikers upon their reporting to Respondent's facility to sign a preferential rehire list;

(g) Discharging employees because of their Union support;

(h) Coercively interrogating employees about their union activities and sympathies or those of coworkers;

(i) Soliciting and impliedly promising to remedy grievances to discourage employees from supporting the Union;

(j) Telling employees they will be fired, or permanently replaced, for exercising their right to strike;

(k) Threatening to fire employees or otherwise interfering with their rights to self-organize;

(l) Conveying to employees that further bargaining with the Union would be futile;

(m) Telling employees that the Union is to blame for the fact that employees have not received a wage increase;

(n) Taking photographs of employees, who are engaged in peaceful picketing during the course of a strike against Respondent, for the purpose of harassing them;

(o) Calling the police on peaceful strikers for the purpose of harassing them;

(p) Bypassing the Union and engaging in direct dealing with Maintenance Unit or Drivers Unit employees with regard to contract terms;

(q) Threatening to make regressive bargaining proposals;

(r) Discriminating against employees by not following its normal practice of directly depositing paychecks and instead mailing final pre-strike paychecks to its employees in order to harass them for engaging in a strike;

(t) Discriminating against employees by requiring them to complete new-hire paperwork as a condition of returning to their former positions;

(u) Discriminating against employees by requiring them to resign their employment if they are unwilling to return to work in a

position that was not substantially equivalent to their former position;

(v) Discriminating against employees by refusing to allow them to enter through the employee entrance or park in the employee parking lot, refusing to train them, and requiring them to complete new-hire paperwork;

(w) Discriminating against employees by refusing to give them their longevity bonuses;

(x) Discriminating against employees by reducing their wage scales;

(y) In any like or related manner refusing to bargain collectively in good faith with the Union as the collective-bargaining representative of employees in the Maintenance and Drivers Units; and

(z) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed under section 7 of the Act.

## 2. Affirmatively ordered and directed to:

(a) Recognize and, upon request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the Maintenance Unit and Drivers Unit employees regarding their wages, hours, and other terms or conditions of employment;

(b) Meet with the Union at reasonable times and for reasonable periods of time and bargain with them in good faith regarding rates of pay, wages, hours, and other terms and conditions of employment and, if an agreement is reached, embody the terms of the agreement in a signed, written agreement;

(c) Upon the request of the Union, rescind any or all unilateral changes to Maintenance Unit and Drivers Unit employees' terms and conditions of employment and maintain the previous terms and conditions unless and until the Union states its desire not to bargain over a change, a collective-bargaining agreement is reached with the Union, or a lawful impasse is reached in bargaining;

(d) Within five days from the date of the Court's order, offer all of the below listed unfair labor practice strikers, in writing, immediate and full interim reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed:

1. Daniel Arenas
2. Francisco Aveytia
3. Jasen Cardenas
4. Samuel Castro
5. Francisco Cazares
6. Jose L. Cisneros
7. Jesus Dominguez
8. Enrique Felix
9. Victor Flores
10. Arturo Gasca
11. Fernando Gomez
12. Mario Gomez
13. Francisco Gonzalez
14. Rafael Hernandez
15. Eduardo Holguin
16. Javier Jacquez
17. Victor Medrano
18. Roberto Meza
19. Roberto Ortiz
20. Mario Ortiz
21. Moises Pereyra
22. Victor Manuel Puertas
23. Miguel Rascon
24. David Reyes
25. Jose L. Rivas
26. Humberto Valles
27. Juan B. Vargas
28. Adan Vasquez
29. Francisco Villalobos
30. Felix Arteaga

31. Carlos Avalos
32. Juan J. Castillo
33. Jose F. Castillo
34. David L. Chavez
35. Manuel Cordova
36. Jesus Manuel Duran
37. Rito Esquivel
38. Jesus Miguel Gonzalez
39. Luis M. Gonzalez
40. Hector Hernandez
41. Juan De Dios Hernandez
42. Humberto M. Hernandez
43. Vicente A. Juarez
44. Victor Loera
45. Elias Lopez
46. Pedro Luna
47. Alfonso Macias
48. Jose S. Macias
49. Adrian Perez
50. Jesus Ramirez
51. Manuel Ramirez
52. Alejandro Reyes
53. Carlos Rivera
54. Eduardo Turrubiate
55. Eusebio Zapata A.

(e) Remove from Respondent's files any reference to the unlawful discharge of Jose Macias and notify him, in writing, that this has been done and that the discharge will not be used against him in any way;

(f) Post a copy of the instant Order at Respondent's El Paso, Texas, facility where notices to employees are customarily posted, and maintain the posting throughout the pendency of the Board's administrative proceedings, free from all obstructions and defacements, and allow the Board's representatives reasonable access to monitor the compliance with the posting requirement; and

(g) File with the Court, within twenty days of the issuance of the instant Order, a sworn affidavit from a responsible official setting forth with specificity the manner in which Respondent has complied with the terms of the Order.